IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CHRISTINA LIEF F/B/O TASHA LIEF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-274 (GMS) |
| | ) | |
| CAPE HENLOPEN SCHOOL DISTRICT and | ) | |
| the DELAWARE DEPARTMENT OF | ) | |
| EDUCATION, | ) | |
| | ) | |
| Defendants. | ) | |

DEFENDANTS' OPENING BRIEF IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Scott A. Holt, Esquire (No. 3399)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone:     (302) 571-6623; 571-6553
Facsimile:     (302) 576-3299; 576-3461
Email: sholt@ycst.com; mstafford@ycst.com
Attorneys for Defendant Cape Henlopen School District

Dated:  July 24, 2007

**Table of Contents**

Page

NATURE AND STAGE OF THE PROCEEDINGS ................................................................. 1

SUMMARY OF THE ARGUMENT ....................................................................................... 2

STATEMENT OF FACTS ....................................................................................................... 4

    A.   Third Grade 2002/2003. ................................................................................................ 4

        **1.**   T.L.'s Third Grade IEP ............................................................................... 4

        **2.**   Initial Placement ........................................................................................ 4

        **3.**   The IEP team does not sit idle .................................................................. 5

        **4.**   T.L. makes academic and behavioral progress throughout the Third Grade............. 7

    B.   The Fourth Grade IEP (2003/2004 school year)......................................................... 9

        **1.**   Placement.................................................................................................. 10

        **2.**   Occupational Therapy. .............................................................................. 11

        **3.**   T.L. makes meaningful educational progress ......................................... 12

    C.   The Fifth Grade IEP (2004/2005 school year). ......................................................... 12

        **1.**   Placement.................................................................................................. 13

        **2.**   The IEP Team considered the 2004 KKI Report and adopted most of its recommendations. ........................................................................................ 14

        **3.**   T.L.'s educational progress during 5th grade. .......................................... 14

    D.   The Proposed Sixth Grade IEP (2005/2006 school year) .......................................... 15

STANDARD OF REVIEW .................................................................................................... 18

ARGUMENT ......................................................................................................................... 20

I.      T.L. RECEIVED A FAPE DURING HER ENROLLMENT IN THE DISTRICT. ........ 21

II.     THE PROPOSED IEP FOR THE 2005/2006 REGULAR SCHOOL YEAR WAS REASONABLY CALCULATED TO PROVIDE MEANINGFUL EDUCATIONAL BENEFITS. ...................................................................................................................... 27

III.    NO PROCEDURAL VIOLATIONS OCCURRED. ...................................................... 28

IV.   T.L. WAS PLACED IN THE LEAST RESTRICTIVE ENVIRONMENT FOR 5th GRADE AND UNDER THE PROPOSED 6th GRADE IEP.......................................... 30

V.    PLAINTIFF'S OBJECTIONS TO DAVID JEFFERSON'S TESTIMONY AND THE PANEL'S CREDIBILITY DETERMINATIONS ARE WITHOUT MERIT. ................ 32

VI.    PLAINTIFF'S "SECTION 1983" CLAIM MUST BE DISMISSED BECAUSE THE THIRD CIRCUIT HAS HELD THAT CLAIMS UNDER SECTION 504 AND THE IDEA ARE NOT ENFORCEABLE THROUGH SECTION 1983.................................. 34

VII.    THE ALLEGATIONS OF HEARING OFFICER BIAS AND ERRORS IN THE CONDUCT OF THE DUE PROCESS HEARING ARE WITHOUT MERIT. .............. 35

VIII.    THE ELEVENTH AMENDMENT AND THE DOCTRINE OF SOVEREIGN IMMUNITY BAR ANY NON-IDEA OR SECTION 504 CLAIMS RAISED BY PLAINTIFF IN THE PETITION AGAINST THE DELAWARE DEPARTMENT OF EDUCATION. ........................................................................................................... 39

CONCLUSION .................................................................................................................... 40

# TABLE OF AUTHORITIES

## Cases

*A.W. v. Jersey City Public Schools*,
    486 F.3d 791 (3d Cir. 2007) ........................................................................ 3, 35

*Alex R. v. Forestville Cmty. Unit Sch. Dist. #221*,
    375 F.3d 603 (7th Cir. 2004) ............................................................................. 22

*Baer v. Klagholz*,
    339 N.J. Super. 168 (N.J. Super. Ct. 2001) ...................................................... 30

Bd. of Educ. v. Bauer,
    2000 Westlaw 1481464 (D. Md. 2000) ...................................................... passim

*Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*,
    458 U.S. 176 (1982) ........................................................................................ 18

*Brown v. Wilson County Sch. Bd.*,
    747 F. Supp. 436 (M.D. Tenn. 1990) ................................................................ 19

*Burlington Sch. Comm. v. Department of Educ.*,
    471 U.S. 359 (1985) ........................................................................................ 20

*Carlisle Area Sch. v. Scott P.*,
    62 F.3d 520 (3d Cir. 1995) .............................................................................. 30

*Clear Creek Indep. Sch. Dist. v. J.K.*, 400 F. Supp. 2d 991 (S. D. Tex. 2005) ........................... 25

*Coale v. Del. Dep't of Educ.*,
    162 F. Supp. 2d 316 (D. Del. 2001) ................................................................. 26

*D.M. ex rel. E.L. v. Red Clay Consol. Sch. Dist.*,
    2007 Del. Fam. Ct. LEXIS 21 (Del. Fam. Ct. Feb. 13, 2007) ....................22, 26, 38

*DiBuo v. Bd. of Educ.*,
    309 F.3d 184 (4th Cir. 2002) ........................................................................... 28

*Doe v. Cates*,
    499 A.2d 1175 (Del.Supr. 1983); ............................................................... 22, 40

*Doe v. Tullahoma City Sch.*,
    9 F.3d 455 (6th Cir. 1993) ............................................................................... 22

*Edelman v. Jordan*,
    415 U.S. 651 (1974) ........................................................................................ 39

*Fisher v. Bd. of Educ. of the Christina Sch. Dist.*,
    856 A.2d 552 (Del. 2004) ........................................................................... 18, 21

*Florence County Sch. Dist. Four v. Carter*,
    510 U.S. 7, 15 (1993) ...................................................................................... 20

*Fort Zumwalt Sch. Dist. v. Clynes*,
    119 F.3d 607 (8th Cir. 1997) ........................................................................... 21

*Fuhrmann v. East Hanover Bd. of Educ.,*
  993 F.2d 1031 (3d Cir. 1993) .................................................................................. 26

*H.W. v. Highland Park Bd. of Educ.,*
  108 Fed. Appx. 732 (3d Cir. 2004) ..................................................................... 26, 34

*Hendricks Hudson Cent. Sch. Dist. v. Rowley,*
  458 U.S. 176 (1982) ............................................................................................. 22

*J.P. v. W. Clark Cmty Schs.,*
  230 F. Supp. 2d 910 (S.D. Ind. 2002) ................................................................... 25

*Jones v. Washington County Bd. of Educ.,*
  15 F. Supp. 2d 783 (D. Md. 1998) ........................................................................ 19

*Kerkam v. McKenzie,*
  862 F.2d 884 (D.C. Cir. 1991),
  *subsequent opinion,* 931 F.2d 84 (D.C. Cir. 1991) ................................................ 22

*King v. State,*
  203 A.2d 74 (1964) ............................................................................................... 40

*Knable v. Bexley City Sch. Dist.,*
  238 F.3d 755 (6th Cir. 2001) ................................................................................ 28

*Lewisville Indep. Sch. Dist. v. Charles W.,*
  81 Fed. Appx. 843 (5th Cir. 2003) ....................................................................... 21

*M.A. v. Voorhees Twp. Bd. of Educ.,* 202 F. Supp. 2d 345, 364 (D.N.J. 2002) ............... 32

*N.S. v. Commonwealth of Pa. Dep't of Educ.,*
  875 F. Supp. 273 (E.D. Pa. 1995) ........................................................................ 29

*Nathanson v. Medical College of Pennsylvania,*
  926 F.2d 1368 (3d Cir. 1991) ............................................................................... 21

*Oberti v. Board of Educ.,*
  995 F.2d 1204 (3d Cir. 1993) .......................................................................... 30, 31

*Pagano v. Hadley,*
  535 F. Supp. 92 (D. Del. 1982) ............................................................................ 39

*Polk v. Central Susquehanna Intermediate Unit 16,*
  853 F.2d 171 (3d Cir. 1988) ................................................................................. 22

*Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.,*
  172 F.3d 238 (3d Cir. 1999) ........................................................................... 20, 22

*Roland M. v. Concord Sch. Comm.,*
  910 F.2d 983 (1st Cir. 1990) .............................................................................. 26

*Ross v. Framingham Sch. Comm.,*
  44 F. Supp. 2d 104 (D. Mass. 1999),
  *aff'd,* 229 F.3d 1133 (1st Cir. 2000),
  *cert. denied,* 531 U.S. 1089 (2001) ................................................................. 19, 21

*S.H. v. State-Operated Sch. Dist.*,
   336 F.3d 260 (3d Cir. 2003) ......................................................................... 18, 21

Schoenbach v. District of Columbia,
   309 F. Supp. 2d 71 (D.D.C. 2004) ...................................................................... 28

*Shore Reg'l High Sch. Bd. of Educ. v. P.S.*,
   381 F.3d 194 (3d Cir. 2004).......................................................................... 18, 34

*Springer v. Fairfax County Bd. of Educ.*,
   134 F.3d 659 (4th Cir. 1998) ............................................................................... 18

*Susan N. v. Wilson Sch. Dist.*,
   70 F.3d 751 (3d Cir. 1995)............................................................................ 18, 26

*T.R. ex rel. N.R. v. Kingwood Twp. Bd. of Educ.*,
   205 F.3d 572 (3d Cir. 2000)........................................................................... 20, 30

*T.S. v. Indep. Sch. Dist. No. 54*,
   265 F.3d 1090 (10th Cir. 2001) .......................................................................... 28

*Teague Indep. Sch. Dist. v. Todd L.*,
   999 F.2d 127 (5th Cir. 1993).............................................................................. 31

*Town of Burlington v. Dept. of Educ.*,
   736 F.2d 773 (1st Cir. 1984) .............................................................................. 18

*Turnbull v. Fink*,
   668 A.2d 1370 (Del. Supr. 1995) ........................................................................ 40

*Union Sch. Dist. v. Smith*,
   15 F.3d 1519 (9th Cir.) ....................................................................................... 19

*W.B. v. Matula*,
   67 F.3d 484 (3d Cir. 1995)................................................................................. 21

*W.E.B v. Appoquinimink Sch. Dist.*,
   2003 U.S. Dist. LEXIS 12695 (D. Del. July 8, 2003) ........................................ 18

*W.G. v. Bd. of Trustees*,
   960 F.2d 1479 (9th Cir. 1992)............................................................................. 28

*Walczak v. Florida Union Free Sch. Dist.*,
   *142 F.3d 119(2d Cir. 1998)* .............................................................................. 26

*Weiss by Weiss v. School Bd. of Hillsborough County*,
   141 F.3d 990 (11th Cir. 1998).......................................................................... 28

## Statutes

14 Del. C. § 3138...................................................................................................... 38

20 U.S.C. § 1415(i)(2)(C)(ii) ........................................................................18, 29, 35

29 U.S.C. § 794 ..................................................................................................... 3, 35

34 C.F.R. § 104.4 ...................................................................................................... 21

34 C.F.R. § 300.512................................................................................................ 29, 38

42 U.S.C. § 1983 ..................................................................................................2, 34, 39

Individuals with Disabilities Education Act,
  20 U.S.C. § 1400 *et seq* .......................................................................... passim

## Other Authorities

Delaware Constitution, Article I, Section 9 ............................................................... 39

*Delaware Valley Sch. Dist.*,
  38 IDELR 224 (SEA PA 2003).............................................................................. 37

*Marblehead Public Schools*,
  36 IDELR 170 (SEA MA 2002) ............................................................................ 37

U.S. Const. Amend XI........................................................................................... 39

## NATURE AND STAGE OF THE PROCEEDINGS

On June 10, 2005, Plaintiff requested an administrative due process hearing alleging that the Cape Henlopen School District (hereinafter, "the District") had violated the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq* (hereinafter, "the IDEA").  On January 31, 2006, the administrative due process hearing panel (hereinafter, "the Panel") issued its Hearing Decision and Order rejecting all of Plaintiff's claims.  *In the matter of T.L.*, DE DP 05-26. Plaintiff filed a Petition- Appeal Hearing Decision and Order (hereinafter, "the Petition") appealing the decision in the Family Court of the State of Delaware on March 29, 2006. Defendants removed the instant action to the United States District Court for the District of Delaware on April 27, 2006. (D.I. 1).  Plaintiff contested the removal and sought remand to the Family Court.  (D.I. 4).  The Court, however, denied Plaintiff's motion for remand.  (D.I. 6). Defendants filed an Answer to the  Petition on May, 31, 2006. (D.I. 3).  Discovery closed on June 30, 2007.  This is Defendants Opening Brief in support of their Motion for Summary Judgment.

## SUMMARY OF THE ARGUMENT

The Defendants are entitled to judgment as a matter of law on all the claims raised in Plaintiff's Petition.

1.     The Court must affirm the Panel's denial of Plaintiff's request for reimbursement of private school tuition for T.L.'s attendance at The Key School at the Carolina Day School and her request for compensatory education services to be delivered at that location because T.L received a free appropriate public education (hereinafter, "FAPE") while enrolled in the District and because her proposed IEP for the 2005/2006 regular school year (T.L.'s 6th grade year) was reasonably calculated to confer meaningful educational benefits.  The Panel's decision is free from legal error and supported by ample evidence in the record that demonstrates that T.L. made meaningful educational progress while enrolled in the District, and that her IEPs appropriately addressed her areas of need.  In reaching this decision, the Panel credited the extensive testimony of Mr. David Jefferson, a school psychologist employed by the District, and correctly discounted the testimony of Dr. Fields.   This credibility determination by the Panel is entitled to deference because the evidence in the record does not justify a contrary conclusion by this Court.

2.     In addition, Defendants are entitled to judgment as a matter of law on Plaintiff's claims of hearing officer bias and the conduct of the due process hearing.  The record shows that Plaintiff made no objection to any of the panel members, and never asked that any panel member recuse themselves during the hearing.  In addition, the record shows that Plaintiff received the procedural rights and safeguards afforded to parents under the IDEA.

3.     Finally, Defendants are entitled to judgment as a matter of law on Plaintiff's claim under 42 U.S.C. § 1983 ("Section 1983") because the Third Circuit has recently held that Section

1983 is not available to provide a remedy for alleged violations of 29 U.S.C. § 794 ("Section 504") or the IDEA.  *A.W. v. Jersey City Public Schools*, 486 F.3d 791 (3d Cir. 2007).

## STATEMENT OF FACTS

**A.     Third Grade 2002/2003.**

**1.     T.L.'s Third Grade IEP**

T.L. entered the Cape Henlopen School District as a 3rd grade student.   Previously, T.L. had been identified as a special education student in Virginia, and she arrived in the District with an IEP from her previous school.  In September, 2002, T.L.'s IEP team met and developed her 3rd grade IEP.  In developing the IEP, the team relied on multiple sources of information including past evaluations, teacher observations, T.L.'s classroom performance, and input from Plaintiff. (McMahon, 7/25, pp. 37-38; D-105; D-106; D-107).

T.L.'s 3rd grade IEP was reasonably calculated to meet her needs (as they existed at the time) and contained goals and objectives in the areas of reading, language arts, math, social skills, and behavior.  (D-107).  The IEP contained present levels of performance for all the goals and objectives.  All the IEP goals were stated in measurable terms and included measurable short-term objectives designed to describe how T.L. would progress towards each of her long-term goals.  Among other components, T.L.'s 3rd grade IEP contained three pages of accommodations, modifications, supports and services set out by her specific areas of need, including reading, decoding, comprehension, fluency, spelling, written expression, math, behavior, auditory processing, and organization.  (D-107).

T.L.'s 3rd grade IEP was developed over the course of two meetings in September, 2002, and Plaintiff signed in agreement with the program and placement outlined in the IEP. (D-107).

**2.     Initial Placement**

Taking into consideration T.L.'s unique individual needs, the IEP team initially placed her in the intensive learning center ("the ILC") for 3rd grade.  (McMahon, 7/25, pp. 21-22).  The

ILC is a small, self-contained[1] classroom which consisted of six (6) students, a special education teacher, and a paraprofessional.   The small setting allowed Mrs. McMahon, the ILC special education teacher, to modify the curriculum, adjust the pace of instruction to each students' individual level, and provide frequent  positive reinforcement.  (McMahon, 7/25, pp. 21-24).

Mrs. McMahon utilized a multisensory approach in her classroom.  (McMahon, 7/25, p. 45).  A multisensory approach  allows the student to engage all of their senses in the learning process through such devises as, for example, the use of manipulatives and kinesthetics. (McMahon, 7/25, pp. 45-46).  According to Mrs. McMahon, T.L. "fit right in"- she was a "happy child," and she loved to work with the other students in the ILC, and she responded positively to the multisensory approach McMahon utilized in the classroom.  (McMahon, 7/25 pp. 22; 25; 46-47).

### 3.    The IEP team does not sit idle

Throughout the 2002/2003 school year, T.L.'s IEP team did not sit idle but instead actively sought out additional information about T.L. through formal evaluations in order to clarify her needs.  For example, T.L. received an occupational therapy evaluation on November 15, 2002, an auditory processing evaluation on March 26, 2003, and a comprehensive psychoeducational evaluation from the Kennedy Krieger Institute (hereinafter, "KKI") in the spring of 2003.  (McMahon, 7/25, pp. 40, 143-144; D-90; D-91; D-99; D-105).

When the IEP team received the results of T.L.'s various evaluations, the IEP convened, reviewed each evaluation, and incorporated nearly all of the recommendations into T.L.'s

---

[1] In this context, "self-contained" refers to the fact that the students in the ILC spend most of the school day there and are always accompanied by the ILC special education teacher and/or the ILC paraprofessional when they travel outside the ILC.  (McMahon, 7/25, pp. 21-24).

educational program.  In the instances  where the IEP team did not adopt a recommendation, the team had a specific reason for not doing so.

On November 18, 2002, the IEP team reviewed T.L.'s occupational therapy evaluation which reported that T.L. tested above her age level on all tested areas.  As a result, the IEP team concluded that T.L. did not need direct occupational therapy at the time, and Plaintiff did not contest this decision.  (D-98; D-99).

On April 30, 2003 the IEP team reviewed T.L.'s auditory processing evaluation from the Bayhealth Medical Center.  To their credit, T.L.'s teachers had already been using many of the techniques listed in the Bayhealth report, such as the use of visuals.  (McMahon, 7/25, p. 97). The IEP team nevertheless revised T.L.'s IEP to incorporate Bayhealth's recommendations (i.e. the use of an FM system, additional visual cues, Earobics, a daily schedule, a written agenda, redirecting T.L. in class, focusing on the concept of time with her, and sending home her writing prompts and strategies).  (McMahon, 7/25, pp. 40-42; 96-97; D-89; D-107).

Throughout the 2002/2003 school year, the IEP team met on at least ten occasions. Plaintiff attended and actively participated in every meeting.   The IEP team received Plaintiff's input, and often made changes to T.L.'s educational program at Plaintiff's request.  For example, when Plaintiff expressed a specific interest in T.L.'s organizational skills, the IEP team met and discussed it several times.  The IEP team added organizational accommodations to the IEP to supplement what was already being done.  (McMahon, 7/25, p. 41; D-107).  To address T.L.'s rocking behavior, her teachers started using a special non-tippable chair provided by Plaintiff. (McMahon, 7/25, pp. 85-86).  Plaintiff, also asked the IEP team to utilize the behavioral program "1-2-3 Magic" in the classroom with T.L.  Although T.L.'s teachers were already using a number of behavioral techniques with her, they responded to Plaintiff's request, received training in "1-

2-3 Magic," and began using it with T.L.  (McMahon, 7/25, pp. 93-94; Pepper, 7/25, pp. 40-41).

The IEP team ultimately adopted a behavior plan for T.L. that was largely dictated by Plaintiff

and which focused more on teacher behavior than T.L.'s.  (McMahon, 7/25, pp. 92-93; 158-161;

D-107; D-52).

    **4.**      **T.L. makes academic and behavioral progress throughout the Third Grade.**

The evidence in the record shows that T.L. entered the District in the fall of 2002 with

very limited reading skills[2] but made significant progress in the Reading Mastery Program  and

was reading more independently by the end of the school year.  (McMahon, 7/25, pp. 26-27, 33-

34; 169).   Although she could not write a complete sentence at the beginning of the 3rd grade,

(McMahon, 7/25, p. 26), by the end of the year, T.L. was writing four to five sentence

paragraphs independently. (McMahon, 7/25, pp. 25-26).

T.L.'s educational progress is also readily apparent from her near mastery of every goal

and objective contained in the 3rd grade IEP.  Specifically,  in the area of reading under T.L.'s 3rd

grade IEP:

- In September, 2002, T.L. was only able to read a word list at the 2nd  half of the 2nd grade level with 17% accuracy.  By June, 2003, she had advanced to reading word lists at the 3rd grade level with 94% accuracy. (McMahon, 7/25, pp. 61-62; D-107).
- In September, 2002, T.L. could read orally a story passage at the 2nd half of the 2nd grade level with 97% accuracy.  By June, 2003, she could read passages on the 3rd grade level with 95% accuracy.  (McMahon, 7/25, p. 63; D-107).
- In September, 2002, when given a reading passage at the 2.5 grade level, T.L. could only read and orally answer comprehension questions with 59% accuracy. In contrast, by June, 2003, T.L. could read and orally answer comprehension

---

[2] Mrs. McMahon testified that T.L. was reading at a 1st grade level at the beginning of 3rd grade in the fall of 2002.  (McMahon, 7/25, pp 60-61).   She based this opinion on T.L.'s performance on the Brigance tests given to assess T.L.' present level of performance.  (McMahon, 7/25, p. 60).  Mrs. McMahon testified that the Brigance test is a standardized measure that tests a variety of competencies. (McMahon, 7/25, pp. 57-60).

questions on reading passaged at the 3rd grade level with 95% accuracy. (McMahon, 7/25, p. 63; D-107).

- In September, 2002, when given a reading passage at the 2.5 grade level, T.L. could only read and write answers to comprehension questions with 41% accuracy. By June, 2003, she was answering multiple choice questions at the 3rd grade level with 100% accuracy. (McMahon, 7/25, p. 64; D-107).

In addition, T.L. made consistent improvement on the Brigance tests which were

administered several times over the course of 3rd grade.   (McMahon, 7/25, pp. 61-65).

T.L. made similar advances in the area of language arts:

- In September, 2002, when given a class writing prompt, T.L. could capitalize proper nouns imbedded within a sentence with only 23% accuracy.  By June, 2003, she could perform the same task with 90% accuracy. (McMahon, 7/25, pp. 69-70; D-107).
- In September, 2002, when given a class writing prompt, T.L. could use proper subject/verb and noun/pronoun agreements 33% of the time.  By June, 2003, she could perform the same task with 80% accuracy.  (McMahon, 7/25, p. 70; D-107).
- In September, 2002, when given a class writing prompt, T.L. could use conventional spelling with 50% accuracy.  By June, 2003, she had improved to 94% accuracy. (McMahon, 7/25, p. 71; D-107).
- In September, 2002, when given a writing piece, T.L. needed to be prompted to use consistent organizational structure.  By June, 2003, she was doing this independently 75% of the time.   (McMahon, 7/25, p. 72; D-107).
- In September, 2002, T.L. required prompting to provide appropriate elaborative details in her writing.  By June, 2003, she was providing such elaboration independently 75% of the time. (McMahon, 7/25, p. 72-73; D-107).

Equally important, T.L.'s behavior had improved "tremendously,"  (McMahon, 7/25, p.

105), a fact acknowledged by the Plaintiff. (D-98).  In fact, T.L.'s behaviors improved so much

over the course of 3rd grade that the IEP team changed her placement from the ILC to a less

structured and more inclusive LRE classroom.  (McMahon, 7/25, p. 105).

T.L.'s behavioral and social skill development is reflected in her progress on the IEP.

T.L. progressed in her social skill behavior among her peers and adults and in her positive

classroom behaviors:

- In October, 2002, she respected the personal space of others only about one out of four times. By June, 2003, she was doing this three out of four times. (McMahon, 7/25, pp. 80-81; D-107).
- In October, 2002, she cooperated with an adult only one out of four times. By June, 2003, she had improved to three out of four times. (McMahon, 7/25, pp. 80-81; D-107).
- In September, 2002, T.L. remained on-task during instruction for ten minute intervals with less than one prompt about 79% of the time. By June, 2003, she had improved to 86%. (McMahon, 7/25, pp. 81-82; D-107).
- In September, 2002, T.L. left her assigned area during instruction an average of 6 times per day. By June, 2003, she was down to three times per day. (McMahon, 7/25, pp. 82-83; D-107).

Consistent with her overall improvement, T.L. also advanced in her 3rd grade IEP math goals and objectives involving word problems, regrouping, multiplications, the concept of time, money, and temperature. (McMahon, 7/25, pp. 74-79; D-107).

### B.    The Fourth Grade IEP (2003/2004 school year).

T.L.'s 4th grade IEP was developed in June, 2003. This time, the IEP team had the benefit of her 3rd grade teachers' experience working with T.L. In developing the 4th grade IEP, the team relied on T.L.'s classroom performance, evaluation materials, parental input, her performance on the Brigance measures, and the 2003 Evaluation Report from KKI. The team discussed the 2003 KKI evaluation at length, and incorporated nearly all of its recommendations into T.L.'s IEP. (McMahon, 7/25, pp. 106-116).[3] T.L.'s 4th grade IEP continued to focus on her same areas of need, but the team raised the standards and expectations from the 3rd grade IEP. (McMahon, 7/25. p. 103).

---

[3] Interestingly, one of the recommendations from the KKI 2003 Evaluation Report that was not incorporated into T.L.'s 4th grade IEP was the recommendation that she receive extended school year ("ESY") services. This was done at Plaintiff's insistence. (McMahon, 7/25, p. 108-109). Moreover, Mrs. McMahon also testified that T.L.'s teachers were already utilizing many of the recommendations provided in the KKI 2003 Evaluation Report but included them as additional accommodations because they appeared in a formal evaluative report. (McMahon, 7/25, pp. 115-117).

T.L.'s 4th grade IEP was tailored to her needs, as they existed at that time, and contained goals and objectives in the areas of reading, written expression, organization, behavior, and math computation. (D-76). In addition, the IEP contained thirty-five accommodations, modifications, supports, and services to address T.L.'s classroom needs. These included the use of a multi-sensory approach, positive behavioral supports, a structured learning environment, and the use of visuals. (D-76). While the 4th grade IEP contained behavioral supports, the team also carried over the separate behavior plan from her 3rd grade IEP with some modifications. (D-52; Pepper, 7/26, pp. 33, 37).

### 1.    Placement

Due to the progress T.L. made during 3rd grade, the IEP team changed her 4th grade placement to a less structured, more inclusive, environment. In 4th grade, T.L. received special education instruction in the resource room from Mr. Pepper in the areas of English and language arts. The resource room contained approximately eight to nine students, all of whom had special needs. As in 3rd grade, Mr. Pepper also utilized a multisensory approach[4] to learning in his classroom. (Pepper, 7/25, pp. 27-28). T.L. received instruction in a regular education classroom for social studies and science. This class contained roughly twenty to twenty-six of her peers. (Pepper, 7/25, pp. 17-18). T.L.'s 4th grade placement provided her more integration with her non-disabled peers, and more movement throughout the school building. Plaintiff signed in agreement with the program and placement outlined in T.L.'s 4th grade IEP. (D-76).

To ease T.L.'s transition to this less restrictive placement, she was provided with a dedicated one-on-one paraprofessional, Candice Ruckle. (Pepper, 7/25, p. 18). Ms. Ruckle

---

[4] Mr. Pepper also provided a definition of what a multisensory approach to teaching entails, (Pepper, 7/25, pp. 28-29), and a lengthy description of how he utilized it in the classroom. (Pepper, 7/26, pp. 93-96). He also testified that his multisensory approach with T.L. was based on the Orton-Gillingham method. (Pepper, 7/26, p. 51).

provided tremendous support to T.L. in her classes and throughout the school day.  Among other things, Ms. Ruckle prompted T.L. to keep her on-task, redirected her when she was distracted or fatigued, helped with note taking and organization, and scribed for her when needed.  Ms. Ruckle was "very effective" in working with T.L. in the 4th grade. (Pepper, 7/25, pp. 21-22).

## 2. Occupational Therapy.

T.L. also received occupational therapy for her handwriting during 4th grade.  On August 19, 2003, she received a second occupational therapy evaluation by the District.  The results indicated that her ability to perform writing tasks smoothly and efficiently was impaired due to impaired kinesthetic feedback, impaired orthographic coding, and poor letter formation.  (D-75; Reynolds, 7/26, pp. 109-113).  In response, the IEP team incorporated occupational therapy goals and additional accommodations into T.L.'s 4th grade IEP and she began receiving occupational therapy using the Handwriting Without Tears Program.  (D-75; D-76; Reynolds, 7/26, pp. 112-114).

In the course of the 2003/2004 school year, T.L. made excellent progress mastering two out of three occupational therapy IEP objectives. (D-75; D-59; Reynolds, 7/26, pp. 114-188).  In May, 2004, T.L.'s occupational therapist, Jennifer Reynolds, evaluated her again and compared the results against previous testing completed in 2003.  At the time of the May 2004 testing, T.L.'s progress since 2003 was quite evident in the test results.  (D-59; Reynolds, 7/26, pp. 124-125).

Given T.L.'s above age performance in the areas of visual perception and visual motor control, she was discharged from occupational therapy.  (D-59; D-58; Reynolds, 7/26, p. 125).  However, the IEP team continued to address these areas through the IEP by, for example, giving her additional time to complete tasks.  (D-76).  Plaintiff reported that she was pleased with T.L.'s

progress and the success of the occupational therapy intervention, and she even noticed her writing more in cursive at home.  (Reynolds, 7/26, p. 126).

> **3.      T.L. makes meaningful educational progress**

The appropriateness of T.L.'s 4th grade IEP is easily illustrated by the meaningful educational progress she made over the course of the 2003/2004 school year.  On the Brigance measures (which Mr. Pepper administered on a quarterly basis throughout 4th grade), T.L.'s word recognition skills improved almost two full grade levels; her passage reading advanced one grade level; and her reading comprehension skills were 100% on a 4th grade level at the end of the school year.  (Pepper, 7/26, pp. 9-12, 73-74; P-10).  T.L. also made progress on her IEP reading goals and objectives.  For example:

- In June, 2003, when presented with a list of words at the 3rd grade level, T.L. was able to read the list with 60% accuracy.  By March, 2004, she could read word lists at the 5th grade level with 80% accuracy. (Pepper, 7/26, pp. 18-20; D-76).
- In June, 2003, when given a story or passage written at the lower 3rd grade level, she could read the selection orally with 95% accuracy.  By June, 2004, she could read material at the 5th grade level with 91% accuracy.  (Pepper, 7/26, pp. 18-20; D-76).
- In June, 2003, when given a story or passage written at the lower 3rd grade level, she could read the selection silently and answer written multiple choice questions with 100% accuracy.  By June, 2004, she could do it with 100% accuracy at the 4th grade level.  (Pepper, 7/26, pp. 18-20; D-76).

**C.      The Fifth Grade IEP (2004/2005 school year).**

In June, 2004, the IEP team developed T.L.'s 5th grade IEP over the course of two meetings.  (D-50).  As with previous IEP's, Plaintiff signed in agreement with the program and placement outlined in the IEP.  (D-50).  T.L.'s 5th grade IEP was reasonably calculated to meet her needs, as they existed at that time, containing goals and objectives in the areas of reading comprehension, written expression, decoding, reading fluency, spelling, and math computation.  (D-50).  Among other components, her 5th grade IEP contained two and a half pages of

accommodations, modifications, supports and services set out by her specific areas of need including reading, math, task completion, classroom organization, and behavior.  (D-50).

### 1.    Placement

Under her 5th grade IEP, T.L. was placed in a small-group resource room instructional setting.  (Dewitt, 7/26, p. 163; Lingelbach, 8/27, p. 144).  Initially, she was placed in a resource room taught by Mrs. Dewitt, a special education teacher with National Board Certification in Exceptional Needs Early Childhood, for math, spelling, writing, and reading.  (Dewitt, 7/26, p. 159; D-4).  As with her previous special education teachers, Mrs. Dewitt also utilized a multisensory approach with T.L. in her classroom.  (Dewitt, 7/26, pp. 183-184).  Plaintiff, however, expressed disagreement with Mrs. Dewitt's instructional style and demeanor.  While the District did not share Plaintiff's view, it nonetheless changed T.L.'s schedule to accommodate Plaintiff's demands.  (Dewitt, 7/26 pp. 169, 186-187).[5]  In October, 2004, T.L.'s classroom placement was changed to Mrs. Lingelbach's resource room for reading and math- she remained in Mrs. Dewitt's resource room for spelling and written expression.  (Dewitt, 7/26, pp. 169-170; Lingelbach, 8/27, pp. 143-144; Joynes, 7/22, pp. 150-152).  T.L. received instruction in a regular education classroom for social studies, science, and her related arts. (D-50).

T.L.'s one-on-one paraprofessional continued to support her throughout the 5th grade. Once again, Ms. Ruckle was "instrumental" in redirecting T.L., keeping her focused and organized.  (Dewitt, 7/26, p. 171; Lingelbach, 8/27, pp. 146-147).

---

[5] Subsequent to this classroom change, Plaintiff accused Mrs. Dewitt of abusing T.L.  When Plaintiff lodged allegations, school administrators thoroughly investigated the charges and found no evidence whatsoever to substantiate Plaintiffs claims.  (Dewitt, 7/26, pp. 189; Joynes, 7/22, pp. 152-153; D-19).

### 2.    The IEP Team considered the 2004 KKI Report and adopted most of its recommendations.

Plaintiff requested a second evaluation by KKI.  (Pepper, 7/26, pp. 41-43; D-63).  The District approved the request, and KKI completed a second evaluation of T.L.

On October 21st and 28th, 2004, the IEP team spent two full school days reviewing the 2004 KKI Evaluation.  The team discussed the recommendations one-by-one, and incorporated most of them into T.L.'s IEP.  (Dewitt, 7/26, pp. 218-223, 232-233; Joynes, 7/22, p. 138; D-46; D-47).  When Plaintiff demanded that the District use the Wilson Reading program as recommended by the KKI 2004 Evaluation Report, the District contacted the KKI evaluator, Dr. Fessler, to determine whether the District's methodology was appropriate for T.L.  (Joynes, 7/22, p. 138; Lingelbach, 8/27, pp. 161-165).  Dr. Fessler confirmed that the District's methodology, Open Court Interventions, Reading Assist, and Read Naturally, was appropriate.  (Joynes, 7/22, p. 138; Lingelbach, 8/27, pp. 161-165; D-41).  In an e-mail dated December 6, 2004, Dr. Fessler specifically agreed "that use of Reading Naturally and Reading Assist, with fidelity, would likely be of comparable value to the Wilson program in effecting reading progress for [T.L.]."  (D-41).

### 3.    T.L.'s educational progress during 5th grade.

T.L.'s progress under her 5th grade IEP is readily apparent.  For example, she received a "3" in reading on the Delaware State Testing Program ("DSTP"), which indicates that she met the state standards for reading.  (Dewitt, 7/26, pp. 274-275).  A comparison of T.L.'s work samples between September, 2004 and May, 2005 show significant growth.  On September 19, 2004, T.L. was given 20 minutes to write a paragraph describing what she wanted to learn during the year.  She struggled, could not get her thoughts down, and she only wrote five words and a heading,  (Dewitt, 7/26, pp. 213-214; D-135).  At the end of the year, however, T.L. produced a longer essay in her own handwriting reflecting appropriate word choice, proper use of editing

procedures, detail, explanation, and descriptives. (Dewitt, 7/26, pp. 214-218; D-135). A comparison of the two writing pieces shows good progress. (Dewitt, 7/26, p. 214-215). In fact, T.L. received a "3" on her second sample and met the delaware writing rubric standards. (Dewitt, 7/26, p. 217).

T.L.'s reading skills and behaviors also improved during the 5th grade. (Dewitt, 7/26, 209-210; Lingelbach, 8/27, pp. 150-153). At first, T.L. started out working in 3rd grade level books, but by the end of the year, she was utilizing the same 5th grade books as her peers. (Lingelbach, 8/27, pp. 152-153).

In the area of decoding, T.L. made meaningful progress:

- In October, 2004, when given a list of 25 multi-syllabic words at a 3rd grade level, T.L. could read the list with 92% accuracy. By April, 2005, T.L. was at 96% accuracy with 5th grade level lists. (D-50).

T.L. also made noticeable improvements in the area of reading comprehension:

- In November, 2004, when given a reading passage at a 3rd grade level, she could read the passage and answer short questions with 93% accuracy. By April, 2005, she was at 95% accuracy on a modified 5th grade level. (D-50).
- In November, 2004, when given a reading passage at a 3rd grade level, T.L. could read the passage and answer multiple-choice questions with 90% accuracy. By April, 2005, she was at 98% accuracy on a modified 5th grade level. (D-50).

**D.    The Proposed Sixth Grade IEP (2005/2006 school year)**

T.L.'s 6th grade IEP was developed over the course of two ½ day IEP meetings in May, 2005. (D-17; D-20). The IEP team included her 5th grade teachers to assist with her transition to Beacon Middle School. In developing the 6th grade IEP, the team relied on T.L.'s classroom performance, evaluation material, parental input, her progress in 5th grade, and the 2004 KKI evaluation report. (Lingelbach, 8/27, pp. 174-175; D-17; D-20). The 6th grade IEP continued to focus on T.L.'s areas of need, and the team raised the goals and expectations from the 5th grade IEP. (Lingelbach, 8/27, p. 174; D-16).

The 6th grade IEP was tailored to T.L.'s needs and contained goals and objectives in the areas of written expression, reading, fluency, comprehension, decoding, spelling, and math. (D-16; Lingelbach, 8/27, p. 177-178). In addition, the IEP contains two and a half pages of accommodations, modifications, supports, and services to address T.L.'s needs including, the use of a multi-sensory approach, positive behavioral supports, extended time, and small group instruction in her weaker areas of reading and language arts. (D-16).

Under the 6th grade IEP, T.L. was to receive 50 minutes a day, 5 hours a week, of direct one-on-one tutoring through the "Reading Assist" method in addition to her special education reading instruction. (Lingelbach, 8/27, pp. 181-182; D-16). Plaintiff expressed a preference for using "Reading Assist" and the District, while believing that the programs it was already utilizing were appropriate for T.L., was willing to try to work with Plaintiff and accommodate her preferences. (Lingelbach, 8/27, pp. 180-182).

Given T.L.'s success in 5th grade, the IEP team proposed the continuation of her placement in a resource room setting for reading, math, and language arts during 6th grade. (Lingelbach, 8/27, p. 182). For science and social studies, T.L. would again receive instruction in a regular education classroom with team teaching by a regular and a special education teacher. (Lingelbach, 8/27, p. 182). In addition, Beacon Middle School had staff trained in Reading Assist (a program based on the Orton Gillingham method) and its teachers already implemented a multisensory approach to learning. (Joynes, 7/22, p. 224)

T.L.'s proposed 6th grade IEP was based on the then-current information provided by her teachers, it addressed her specific areas of need for reading, and it provided her one period per day of tutoring in Reading Assist. (Joynes, 7/22, pp. 184-185). It would have enabled her to remain in her home school with the peers she had known for the past three school years. *Id.* Of

course, Plaintiff removed T.L. from the District and she did not attend the 6th grade at Beacon Middle School.

## STANDARD OF REVIEW

In considering an appeal from a special education due process hearing panel's decision, the Court is to apply a modified *de novo* standard of review. *S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 270 (3d Cir. 2003); *see also, Fisher v. Bd. of Educ. of the Christina Sch. Dist.,* 856 A.2d 552, 557-58 (Del. 2004). Under this standard, "the panel's findings of fact are considered *prima facie* correct. The Panel's decision must be given due weight; and its witness credibility determinations 'deserve deference unless … the record read in its entirety would compel a contrary conclusion.'" *Fisher,* 856 A.2d at 557-58; *S.H.*, 336 F.3d at 270. The Court must explain any failure to adhere to the administrative findings, and must give deference to the credibility determinations made by the hearing panel unless the evidence in the record justifies a contrary conclusion. *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). In making it's determination, the Court must not "substitute '[its] own notions of sound educational policy for those of the school authorities.'" *Fisher,* 856 A.2d at 558 (*citing Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206-07 (1982)). Indeed, deference to the special educational expertise possessed by administrative hearing panels is well-established in the case law interpreting the IDEA. *See Rowley*, 458 U.S. at 206-07; *Springer v. Fairfax County Bd. of Educ.*, 134 F.3d 659, 667 (4th Cir. 1998); *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 758 (3d Cir. 1995); *Town of Burlington v. Dept. of Educ.*, 736 F.2d 773, 792 (1st Cir. 1984); *W.E.B v. Appoquinimink Sch. Dist.*, 2003 U.S. Dist. LEXIS 12695 at *4-5 (D. Del. July 8, 2003).

Although the IDEA provides that district courts will receive the records of the administrative proceedings and "hear additional evidence at the request of a party," 20 U.S.C. § 1415(i)(2)(C)(ii), courts routinely grant summary judgment where, as here, no genuine dispute of

material fact exists. *See e.g., Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1523-24 (9th Cir.), *cert. denied,* 513 U.S. 965 (1994); *Jones v. Washington County Bd. of Educ.*, 15 F. Supp. 2d 783 (D. Md. 1998) (awarding summary judgment for defendant); *Brown v. Wilson County Sch. Bd.*, 747 F. Supp. 436 (M.D. Tenn. 1990).  As one court has noted, "a court is authorized to decide the case 'as a matter of law' on motion for summary judgment if enough of the administrative findings and evaluative determinations are so well-founded that any other finding of fact that might be questioned is no longer material to [the] outcome."  *Ross v. Framingham Sch. Comm.*, 44 F. Supp. 2d 104, 113 (D. Mass. 1999), *aff'd*, 229 F.3d 1133 (1st Cir. 2000), *cert. denied*, 531 U.S. 1089 (2001).

## ARGUMENT

Plaintiff's Petition raises a confusing jumble of allegations directed at both the conduct of the due process hearing, the panel members, and the Panel's decisions that T.L. received a FAPE, and that her proposed 6th grade IEP was reasonably calculated to confer meaningful educational benefits.

The disposition of the instant matter, however, involves a very straightforward and simple analysis. The Plaintiff has a right to reimbursement for the costs incident to her unilateral placement of T.L. at The Key School at Carolina Day School only if this Court "concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." *T.R. ex rel. N.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 582 (3d Cir. 2000) (quoting *Florence County Sch. Dist. Four v. Carter,* 510 U.S. 7, 15 (1993)). As the Supreme Court has taught, "[u]nilateral private placement is effected at the parents' financial risk . . . if the IEP is later determined by a court to have been appropriate." *Burlington Sch. Comm. v. Department of Educ.*, 471 U.S. 359, 372 (1985). Similarly, Plaintiff has a right to compensatory education only if this Court determines that T.L. was denied a FAPE at some point during the 2002/2003, 2003/2004, or 2004/2005 school years. *See e.g., Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 249-50 (3d Cir. 1999) ("[a]n award of compensatory education" is made in order to remedy "earlier deprivation[s] of [a FAPE]… [A] disabled student's right to compensatory education accrues when the school knows or should know that the student is receiving an inappropriate education.").

The Panel, rejecting each of Plaintiff's claims, concluded that the District provide T.L. with a FAPE for 3rd through 5th grade,  and that the proposed 6th grade IEP was reasonably calculated to provide FAPE in the least restrictive environment ("LRE").   In the instant matter,

the Panel's findings of fact must be "considered *prima facie* correct" and it's decision is entitled

to "due weight." *Fisher,* 856 A.2d at 557-58; *S.H.*, 336 F.3d at 270.   Summary judgment is

appropriate in the instant matter, because the administrative findings and evaluative

determinations are so well-founded that no genuine issues of material fact exist.  *Ross v.*

*Framingham Sch. Comm.*, 44 F. Supp. 2d 104, 113 (D. Mass. 1999), *aff'd*, 229 F.3d 1133 (1st

Cir. 2000), *cert. denied*, 531 U.S. 1089 (2001).

## I.    T.L. RECEIVED A FAPE DURING HER ENROLLMENT IN THE DISTRICT.

Under the IDEA, "[a] free, appropriate public education consists of educational

instruction specially designed to meet the unique needs of the handicapped child, supported by

such services as are necessary to permit the child to 'benefit' from the instruction."  *S.H. v. State-*

*Operated Sch. Dist.*, 336 F.3d 260, 264 (3d Cir. 2003).[6]  Significantly, "[a] free appropriate

public education 'need not be the best one possible, or the one calculated to maximize the child's

educational potential,"  *Lewisville Indep. Sch. Dist. v. Charles W.*, 81 Fed. Appx. 843, 846 (5th

Cir. 2003); *Fort Zumwalt Sch. Dist. v. Clynes*, 119 F.3d 607, 612 (8th Cir. 1997) (a student's IEP

---

[6] The Petition also appears to allege a violation of Section 504.  (Petition, ¶1).  To establish a violation of Section 504, Plaintiff must demonstrate that (1) T.L. is disabled as defined under Section 504; (2) that T.L. is "otherwise qualified" to participate in school activities; (3) the District receives federal financial assistance; and (4) T.L. was excluded from participation in, denied the benefits of, or subject to discrimination at, the District. *Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1380 (3d Cir. 1991); 34 C.F.R. § 104.4. Here, the Court should dismiss Plaintiff's Section 504 claims because Plaintiff has failed to properly plead any of the elements of the *Nathanson* test.  Specifically, the Petition does not indicate that T.L. is disabled, does not indicate that T.L. is otherwise qualified to participate in school activities, does not allege that any of the Defendants receive federal financial assistance, and does not allege that T.L. was excluded from participation in, denied the benefits of, or subjected to discrimination at, the District.  As such, the Petition does not properly state a claim under Section 504. Alternatively, should the Court chose not to dismiss the Section 504 claim, Defendants are entitled to judgment as a matter of law for the same reasons outlined *infa* that apply to Plaintiff's IDEA claims.  *See e.g.*, *W.B. v. Matula*, 67 F.3d 484, 492-93 (3d Cir. 1995) (comparing FAPE requirement in IDEA and Section 504's "appropriate education" requirement and finding that "there appears to be few differences, if any, between IDEA's affirmative duty and Section 504's negative prohibition.").

need not maximize their potential nor provide for the best possible education); *Doe v. Tullahoma City Sch.*, 9 F.3d 455, 459-460 (6th Cir. 1993) (IDEA "requires that the [school district] provide the educational equivalent of a serviceable Chevrolet to every handicapped student . . . .  [T]he [school district] is not required to provide a Cadillac . . . ."); *D.M. ex rel. E.L. v. Red Clay Consol. Sch. Dist.*, 2007 Del. Fam. Ct. LEXIS 21, *24-25 (Del. Fam. Ct. Feb. 13, 2007) (recognizing that "the requirement that a State provide specialized educational services to handicapped children [does] not create an additional requirement that the service provided be sufficient to maximize each child's potential equal with the opportunity provided other children" and that "[a]n appropriate education does not mean the absolute best or 'potential-maximizing' education available"), and "proof that loving parents can craft a better program than a state offers does not, alone, entitle them to prevail under the Act." *Kerkam v. McKenzie*, 862 F.2d 884, 886 (D.C. Cir. 1991), *subsequent opinion*, 931 F.2d 84 (D.C. Cir. 1991).

In *Hendricks Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176 (1982), the Supreme Court established a two-part test for determining the validity and/or appropriateness on an IEP.  The first prong of that test requires compliance with the procedural requirements of the IDEA. Second, an IEP must also be reasonably calculated to provide the child with a "meaningful educational benefit."  *Ridgewood v. Bd. of Ed. v. N.E.*, 172 F.3d 238, 247-48 (3d Cir. 1999); *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171 (3d Cir. 1988).  The requisite degree of progress required varies depending on the student's abilities.  *Alex R. v. Forestville Cmty. Unit Sch. Dist. #221*, 375 F.3d 603, 615 (7th Cir. 2004).

In the instant matter, after noting that the District carried the burden of proof under Delaware law, the Panel determined that T.L. received a FAPE during the 2002/2003, 2003/2004, and 2004/2005 school years. (Order, p. 17).   The Panel found that "[t]he IEPs set

forth clear goals and the progress reports monitored the Student's progress on a quarterly basis.

Progress was shown throughout the years in question." (Order, p. 17).

In so holding, the Panel specifically noted that "the School District presented extensive

testimony from teachers and staff at the Elementary School.  The testimony presented was very

thorough and presented a consistent picture of Student and Student's needs and weaknesses.  The

testimony included a detailed and exhaustive review of each of Student's IEPs as well as the

meetings that were held between Parent and the School District to discuss, review, and, in some

cases, modify the IEPs."  (Order, p. 3).  The Panel also noted that it had "thoroughly reviewed

the transcript, which consisted of over one thousand pages." *Id.*

In making its determination, the Panel noted that it appeared that:

> the Parent's main issue as to the denial of FAPE is the [KKI 2004
> Evaluation Report] where… the Parent has taken a score on one
> subtest and used it to say that Student has not progressed in reading
> during the three years at the Elementary School.  Using the results
> of that subtest, Parent would like this Panel to say that there was a
> denial of FAPE.  However that sentence cannot be viewed in
> isolation.  First, a test such as the evaluation provided by the [KKI
> 2004 Evaluation Report] is a "snapshot in time."  It represents the
> findings of an examiner on a particular day at a particular time
> given the situation  of the child on that day and time.  The Hearing
> Panel spent a great deal of time listening to the findings of the
> [KKI 2004 Evaluation Report] and learning about the School
> District's response to the recommendations presented in the [KKI
> 2004 Evaluation Report].  The IEP team met on several occasions
> to review the [KKI 2004 Evaluation Report] in the fall of 2004 and
> implemented most of the recommendations…Changes in the
> reading program were made and the IEP progress notes for Student
> during the 2004-2005 school year show consistent progress on all
> of the reading goals.  Additionally, the [KKI 2003 Evaluation
> Report] was conducted while Student was taking medication for
> her ADHD, and the [KKI 2004 Evaluation Report] states that
> Student was not taking that medication at the time of the 2004
> testing.  As pointed out by the [KKI] Psychologist the reliability of
> the [KKI 2004 Evaluation Report] testing is not certain given the
> difference in Student's behavior without the medication.

(Order p. 18; *see also*, Joynes, 7/22, p. 187-189 (noting that there is more than one way to measure academic progress and indicating that the KKI 2004 Evaluation Report is merely a snapshot)). The Panel's finding is well-supported by the testimony and evidence contained in the administrative record.

At the due process hearing, Plaintiff testified that T.L made no reading progress while in the District and was reading at the 2nd grade level in 5th grade. (C.L. 12/12, p. 94-98). This claim is premised on T.L.'s score on a single subtest of the Woodcock-Johnson test given during the 2004 KKI evaluation. The District presented extensive testimony, however, demonstrating both that such a tunnel-vision approach to interpreting educational assessments is misplaced and casting significant doubt on the accuracy/validity of the scores reported in the KKI 2004 Evaluation Report.

As Mr. Jefferson testified, it's an error to focus on one subtest of the Woodcock-Johnson psychoeducational test battery in making opinions about T.L.'s reading ability. Instead, when viewed in conjunction with her other scores, the result of that subtest indicates that it's an "isolette, an anomaly in the overall assessment of this youngster." (Jefferson, 8/27, p. 54-55). Indeed, Mr. Jefferson testified at great length regarding how the results obtained on the Wechsler Individual Achievement Test II in the 2003 and 2004 KKI evaluations actually reflect T.L.'s progress. (Jefferson, 8/27, pp. 29-47, 52). In addition, Mr. Jefferson explained in detail the significance of the distractibility and medication concerns noted in the 2004 KKI Evaluation Report and their impact on the validity of the testing results. (Jefferson, 8/27, pp. 47, 125-126; D-53). As Mr. Jefferson explained, part of a psychologist's job "beyond the mechanics of administering the test is to set the stage for optimum measurement, optimum assessment, and to take into account or to speak to any of the things that may impinge on, or may compromise that,

may have a negative impact on that."  (Jefferson, 8/27, p. 47).  With that in mind, Mr. Jefferson pointed out a number of the concerns about test behavior and distractibility noted in the 2004 KKI Evaluation Report, which included observations indicating that T.L. was "fidgety," bounced in her chair, was "distractible and inattentive to detail," and that these behaviors became more pronounced as the day-long testing session progressed.  (Jefferson, 8/27, pp. 49-52; D-53).  In considering these behaviors the 2004 KKI Evaluation Report itself specifically states that "*It is not known how much difference would be accrued,, particularly in a structured one-to-one setting, by provision of medication.*"  (D-53 (emphasis added)).  As such "the clinical implications of distractibility and inattentiveness" must be recognized when evaluating T.L.'s performance on the various measures in the KKI 2004 Evaluation Report, particularly since the length of the all-day testing session was less then optimal and likely to induce fatigue. (Jefferson, 8/27, pp. 51, 131-132; ).

Setting aside Plaintiff's argument that the score on a lone subtest obtained by an admittedly distractible and un-medicated T.L., as reported in the KKI 2004 Evaluation Report, establishes that T.L. did not receive a FAPE from 3rd grade through 5th grade, it is well-established that the District is obligated to provide a free, appropriate public education–not specific academic results.  As one District Court has noted, a "FAPE does not guarantee a particular outcome."  *Clear Creek Indep. Sch. Dist. v. J.K.*, 400 F. Supp. 2d 991, 995 (S. D. Tex. 2005); *see also J.P. v. W. Clark Cmty Schs.*, 230 F. Supp. 2d 910, 919 (S.D. Ind. 2002) ("the measure of appropriateness for an IEP does not lie in the outcomes achieved").  Ample evidence in addition to the KKI evaluations shows that T.L. did, in fact, receive a FAPE.  As noted *supra,* T.L.'s academic progress between her 3rd and 5th grade years is reflected in a range of measures

including, but not limited to, her scores on the Brigance tests, on the DSTP, and in her demonstrable progress towards mastery of her various IEP goals and objectives.

Simply put, the IDEA only provides an entitlement to receive the services enumerated in the IEP; it provides no guarantees as to educational success or outcome. *See Walczak*, 142 F.3d at 133; *Coale v. Del. Dep't of Educ.*, 162 F. Supp. 2d 316, 326 (D. Del. 2001) (child's IEP is not a contract offering guarantees that a student will achieve certain amounts of academic proficiency).

Finally, whether an IEP is reasonably calculated to afford a child meaningful educational benefits "can only be determined as of the time it is offered to the student and not at some later date. Neither the statute [IDEA] nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement." *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993); *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 762 (3d Cir. 1995); *H.W. v. Highland Park Bd. of Educ.*, 108 Fed. Appx. 732, 733-34 (3d Cir. 2004) ("the propriety of an IEP must be judged prospectively"); *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990) (holding that the "actions of school systems cannot, as appellants would have it, be judged exclusively in hindsight. An IEP is a snapshot, not a retrospective. In striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated"); *D.M. ex rel. E.L. v. Red Clay Consol. Sch. Dist.*, 2007 Del. Fam. Ct. LEXIS 21, *34-35 (Del. Fam. Ct. 2007) (appropriateness of IEP must be determined based on information available to district when IEP was written; rejecting plaintiff's argument that appropriateness is to be assessed based on whether the child made educational progress after the IEP was implemented). In this context, the Third Circuit has stressed that "*after-acquired evidence, such as information received*

*through the experience of an alternative placement, should be used by courts only in assessing the reasonableness of the district's initial decisions regarding a particular IEP or the provision of special education services at all.*" *Susan N.*, 70 F.3d at 762 (emphasis added). Here, the evidence shows that each of T.L.'s IEPs for 3rd grade, 4th grade, and 5th grade were reasonably calculated to afford her meaningful educational benefits based on the information the District had when they were developed.

As noted *supra*, the Panel's factual findings are considered *prima facie* correct and its decision is entitled to due weight. A plethora of evidence in the record attests to the education progress made by T.L. from 3rd grade to 5th grade, and to the consideration given to a range of data sources by her IEP teams in developing her educational programming, and supports the Panel's findings of fact. The Panel did not commit any legal error in reaching its decision that T.L. received a FAPE. Therefore, Defendants' are entitled to judgment as a matter of law on Plaintiff's claim that T.L. was denied a FAPE for the 2002/2003, 2003/3004, and 2004/2005 school years.

## II.  THE PROPOSED IEP FOR THE 2005/2006 REGULAR SCHOOL YEAR WAS REASONABLY CALCULATED TO PROVIDE MEANINGFUL EDUCATIONAL BENEFITS.

In the instant matter, Plaintiff alleges that T.L.'s draft IEP for the 2005/2006 school year is inappropriate. The Panel found that the District developed an appropriate IEP for T.L.'s 6th grade year. (Order, p. 13). In so holding the Panel noted that "the 2005/2006 IEP in its draft stages appears to have taken into account Student's needs and weaknesses and proposed appropriate accommodations and goals." The evidence in the record, as outlined and discussed *supra,* demonstrates that the proposed 2005/2006 IEP is reasonably calculated to confer meaningful educational benefits.

### III.   NO PROCEDURAL VIOLATIONS OCCURRED.

It is well-established that "'claims of procedural violations of IDEA do not, in themselves, inexorably lead a court to find a child was denied FAPE.'"  *Simmons v. D.C.*, 355 F. Supp.2d 12, 18 (D.D.C. 2004) (quoting Schoenbach, 309 F. Supp.2d at 78)); *Adam J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 811-12 (5th Cir. 2003); see also *Weiss by Weiss v. School Bd. of Hillsborough County*, 141 F.3d 990, 996 (11th Cir. 1998).  Courts that have addressed this question have uniformly and consistently held that "procedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of an educational opportunity." Adam J. v. Keller Indep. Sch. Dist., 328 F.3d 804, 811-812 (5th Cir. 2003); *T.S. v. Indep. Sch. Dist. No. 54*, 265 F.3d 1090, 1095 (10th Cir. 2001); *DiBuo v. Bd. of Educ.*, 309 F.3d 184, 190 (4th Cir. 2002) (" a violation of a procedural requirement of the IDEA (or one of its implementing regulations) must actually interfere with the provision of a FAPE"); *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 765 (6th Cir. 2001) ("[A] procedural violation of the IDEA is not a per se denial of a FAPE; rather, a school district's failure to comply with the procedural requirements of the Act will constitute a denial of a FAPE only if such violation causes substantive harm to the child or his parents."); *W.G. v. Bd. of Trustees*, 960 F.2d 1479, 1484 (9th Cir. 1992) ("Procedural flaws do not automatically require a finding of a denial of a FAPE" unless the procedural inadequacies result in a loss of educational opportunity "or seriously infringe the parents' opportunity to participate in the IEP formulation process . . .").

In the instant matter, Plaintiff alleges that the Panel failed to recognize and address an "illegal disclosure of confidential information regarding the student to a Union representative and others not part of the IEP process and the resulting violation of student's rights in the decision," and that she "was denied access to all of student's records within the control of the District." (Petition, ¶8, 10).  In addition, at the administrative due process hearing, Plaintiff also

raised allegations of other procedural violations including the District's alleged failure to review

existing data in developing T.L.'s 3rd grade IEP, its alleged failure to provide qualified staff to

work with T.L. during the 2002/2003, 2003/2004, 2004/2005 and 2005/2006 school years, its

alleged failure to consider parental input in the development of all T.L.'s IEPs, and, finally, it's

alleged failure to obtain prior informed consent before testing and evaluating T.L.  (Order, p. 15-

16).

      First, with respect to the alleged disclosure to a Union representative and the alleged

denial of access to educational records, Plaintiff has failed to exhaust her administrative remedies

on these claims, and, although testimony was presented on these topics, they were never properly

raised as an issue for decision by the Panel. See 20 U.S.C. § 1415(l); 34 C.F.R. § 300.512

(requiring exhaustion of administrative remedies); *N.S. v. Commonwealth of Pa. Dep't of Educ.*,

875 F. Supp. 273 (E.D. Pa. 1995) (requiring exhaustion). Setting that failure aside, Defendants

are still entitled to summary judgment, because the alleged violations were procedural in nature,

did not compromise T.L.'s right to FAPE, and, in the case of the disclosure to a Union

representative, were promptly remedied by the District.  (Joynes, 7/22, pp. 147-149, 153-158; D-

40; D-34; D-33).

      With respect to Plaintiff's claims alleging other procedural violations, ample evidence in

the record supports the Panel's findings of fact. (Order, p. 13-16).   For example, the

administrative records shows that the District complied with the requirements of the IDEA by

relying on varied information in developing T.L.'s 3rd grade IEP.  (McMahon, 7/25, p. 36-37; D-

105; D-106).   The staff that worked with T.L. all possessed the requisite qualifications for their

positions.  In addition, the record demonstrates that the IEP team considered Plaintiff's input on

a range of issues.  Finally, Plaintiff's informed consent was not required because no evaluation

was performed by Mr. Jefferson.  Instead, Mr. Jefferson merely observed T.L.'s classroom two

times, and collected and organized behavioral data collected by her teachers.  (Jefferson, 8/27,

pp. 17, 56-57, 60-61, 76).

## IV.  T.L. WAS PLACED IN THE LEAST RESTRICTIVE ENVIRONMENT FOR 5th GRADE AND UNDER THE PROPOSED 6th GRADE IEP.

At the due process hearing, Plaintiff argued that the District failed to provide a continuum

of placement options for the 2004/2005 (5th grade) and 2005/2006 (6th grade) school years.

Under the IDEA, disabled children *must* be educated "in the least restrictive environment that

will provide [them] with a meaningful educational benefit."  *T.R. v. Kingwood Township Bd.*

*Educ.*, 205 F.3d 572, 578 (3d Cir. 2000).  "The least restrictive environment is the one that, to the

maximum extent possible, satisfactorily educates disabled children together with children who

are not disabled, in the same school the child would attend if the child were not disabled."

*Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 535 (3d Cir. 1995).  Moreover, in assessing the

educational benefits of placing a disabled child with non-disabled peers, "the court must pay

special attention to those unique benefits the child may obtain from integration in a regular

classroom . . .the development of social and communication skills from interaction with non-

disabled peers."  *Oberti v. Board of Educ.*, 995 F.2d 1204 (3d Cir. 1993).  In addition, the IDEA

mandates that disabled students have access to the general education curriculum to the maximum

extent possible.  20 U.S.C. § 1400(c)(5)(A); *Baer v. Klagholz*, 339 N.J. Super. 168, 186 (N.J.

Super. Ct. 2001) (noting that IDEA mandates that disabled students "have access in the general

curriculum to the maximum extent possible").

The placement identified under the draft 2005/2006 IEP, and T.L.'s placement in 5th

grade during the 2004/2004 school year, were the least restrictive environment.  Specifically, in

5th grade, and again under the under the draft 6th grade IEP, T.L. was to be educated  in a

resource room setting for reading, math, and language arts and in a regular education classroom for science and social studies.

Thus, the proposed IEP provided for T.L.'s education in an integrated setting with her non-disabled peers to the maximum extent possible, in the same school she would attend if she were not disabled, and with access to the general educational curriculum.   In contrast, The Key School at Carolina Day School is a specialized school which by definition has *no* non-disabled students.

In the end, the arguments in favor of The Key School at Carolina Day School placement advanced by Plaintiff, namely the purported need to educate T.L. in a segregated school specializing in teaching dyslexic students runs directly counter to Congress' express preference in favor of educating disabled student with their non-disabled peers with access to the general curriculum, to the maximum extent possible.  *Corey H. v. Cape Henlopen Sch. Dist.*, 286 F. Supp. 2d 380, 388 (D. Del. 2003) ("[A] court should keep in mind the 'strong Congressional preference for integrating children with disabilities in regular education classrooms'") (*quoting Oberti*, 995 F.2d at 1213); *cf. Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 128 n.2 (5th Cir. 1993) (holding that least restrictive environment requires association with "able-bodied peers to the maximum extent possible.").  Plaintiff's preference also runs directly counter to the IDEA's requirement that T.L. be exposed to the general education curriculum to the maximum extent possible.

Finally, the Plaintiff's arguments in favor of reimbursement for The Key School at Carolina Day School placement, and against the proposed placement outlined in the draft 2005/2006 IEP, confuse the correct standard for determining a LRE.  In short, the legal standard "to be applied  in determining the LRE *is not to find an optimal placement, but to decide whether*

*an appropriate educational placement can be achieved in a non-restrictive setting.*" *M.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 364 (D.N.J. 2002) (emphasis added). Here, regardless of whether The Key School at Carolina Day School constitutes the optimal placement for T.L. (and the District believes it does not), it is manifestly the case that an appropriate education for T.L. could have been achieved in the far less restrictive setting contemplated under the proposed 2005/2006 IEP.

## V.    PLAINTIFF'S OBJECTIONS TO DAVID JEFFERSON'S TESTIMONY AND THE PANEL'S CREDIBILITY DETERMINATIONS ARE WITHOUT MERIT.

In her Petition, Plaintiff argues that the Panel committed legal error by failing "to consider the interpretation of the Kennedy-Krieger reports, relying instead upon the non-expert, unqualified testimony from District employees" (¶ 19), and further, that its reliance on testimony by Mr. David Jefferson, was improper because "he was not qualified to testify." (¶ 24). Neither claim has any merit.

As the hearing Panel noted, Plaintiff "takes a dim view of school psychologists…" (Order, p. 14 n.15; C.L., 12/12, p. 113). Notwithstanding Plaintiff's personal opinions, Mr. Jefferson's resume (D-2) records a long history of professional and academic accomplishments. (Jefferson, 8/27, pp. 6-17; D-2).   As a licensed school psychologist in Delaware, Mr. Jefferson is qualified to interpret the evaluation reports of another school psychologist.  (Jefferson, 8/27, p. 21; D-2).[7]   Moreover, his credentials do not differ in any substantive way from Dr. Fessler's. (Jefferson, 8/27, p. 128-129).   As such, the Plaintiff's allegation that Panel committed legal error

---

[7] Mr. Jefferson provided extensive testimony on his experience evaluating students in the District.  In addition he indicated that he is qualified to administers the Wechsler Individual Achievement Test and "routinely" administers it.  (Jefferson, 8/27, pp. 22-25).   He also testified that he is qualified to administer the tests given by Dr. Fields on July 18, 2000 as reported in her evaluation report.  (Jefferson, 8/27, pp. 146-147; P-22).

by relying upon Mr. Jefferson's testimony because "he was not qualified to testify" is without any merit. (Petition, ¶ 24).

Similarly, the Plaintiff's contention that the Panel "inappropriately ignored" the testimony of "parent's expert witness"[8] also lacks merit. (Petition, ¶ 23). In fact the Panel did not ignore Dr. Fields' testimony- instead, it specifically found that she lacked credibility. (Order, p. 11). As the Panel noted, although Dr. Fields worked with T.L. for a six-month period during 2000-2001, she had not worked with her since she entered the District in the fall of 2002. (Order, p. 11; Fields, 12/12, p. 55). In addition, Dr. Fields asserted that the District erred by not recognizing T.L. as "visually impaired," "hard of hearing," and as "having a communication delay/disorder" on her IEPs. (Order, p. 11-12; Fields, 12/12, pp. 59-61). The Panel specifically found that in so testifying, Dr. Fields displayed a startling lack of knowledge regarding the meanings of those identifiers as they are used in Delaware. (Order, p. 12; Joynes, 12/12, p. 140 (noting that a certification of visual impairment is required in order for the "visual impairment" box on an IEP to be checked in Delaware)). Her testimony was further undercut by her own assertion that T.L.'s Virginia IEP was very good and a model which the District should have followed despite the fact that it too failed to identify her as being "visually impaired," "hard of hearing," and as "having a communication delay/disorder." (Order, p. 12, n.14; Fields, 12/12, p. 160). In addition the Panel also determined that Dr. Fields' testimony that T.L.'s IEPs were inadequate lacked credibility because she misinterpreted the IEPs. (Order, p. 12).

The Panel's decision is well-supported by the testimony of the District witnesses who noted that Dr. Field's testimony interpreting many aspects of the IEP documents themselves was erroneous. (Joynes, 12/12, pp. 137-138). In addition, the District identified problems with the

---

[8] Defendant's assume that the reference to "parent's expert witness" refers to Dr. Rona Fields, identified as "Dr. F." in the Hearing Decision and Order.

measures used by Dr. Field's in her own previous testing of T.L. (Jefferson, 12/12, p. 159 (characterizing Dr. Field's failure to administer any tests of academic achievement in her 2000 evaluation of T.L. as an "obvious omission.")).

Of course, this Court must give deference to the credibility determinations made by the Panel unless the evidence in the record justifies a contrary conclusion. *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004); *H.W. v. Highland Park Bd. of Educ.*, 108 Fed. Appx. 731, 735 (3d Cir. 2004) (witness credibility determinations by hearing officers "who had the opportunity to hear and evaluate [the witnesses] demeanor and persuasiveness" are entitled to special weight). As the Third Circuit has explained, "[i]n this context the word "justify" demands essentially the same standard of review given to a trial court's findings of fact by a federal appellate court." *Shore Reg'l.*, 381 F.3d at 199.

In short, the record is devoid of any evidence that would justify a contrary conclusion to the Panel's determination that Dr. Field's testimony lacked credibility. In fact, the record contains ample evidence supporting the Panel's decision. Moreover, Plaintiff's allegations that the Panel erred by relying upon Mr. Jefferson's testimony are similarly baseless. As such, Defendant's are entitled to judgment as a matter of law on these portions of Plaintiff's claims.

## VI.   PLAINTIFF'S "SECTION 1983" CLAIM MUST BE DISMISSED BECAUSE THE THIRD CIRCUIT HAS HELD THAT CLAIMS UNDER SECTION 504 AND THE IDEA ARE NOT ENFORCEABLE THROUGH SECTION 1983.

In her Petition, Plaintiff mentions 42 U.S.C. § 1983 (hereinafter "Section 1983") in two paragraphs. In Paragraph 1, plaintiff alleges that "IDEA Section 504, CFR 300.125 and 14 Del.C. Section 3122 were improperly applied during the hearing, thereby denying the parent due process." In Paragraph 11, Plaintiff states that "[t]he panel decision and conduct of the hearing gives rise to a violation of student's rights and gives rise to a separate cause of action pursuant to 42 USC Section 1983."

However, the Third Circuit has recently held Section 1983 is not available to provide a remedy for alleged violations of 29 U.S.C. § 794 (hereinafter "Section 504") and/or the IDEA. A.W. v. Jersey City Public Schools, 486 F.3d 791 (3d Cir. 2007).   As such, Defendants are entitled to judgment as a matter of law on Plaintiff's Section 1983 claims.

## VII.   THE ALLEGATIONS OF HEARING OFFICER BIAS AND ERRORS IN THE CONDUCT OF THE DUE PROCESS HEARING ARE WITHOUT MERIT.

In her Petition, Plaintiff makes many allegations regarding the allegedly improper conduct of the due process hearing and the purported bias of the hearing panel members. (See Petition ¶¶ 1, 4, 5, 7, 9, 11, 22).   These allegations are without merit.  With discovery closed, Plaintiff has no admissible evidence indicating bias on the part of any panel member, nor any evidence that the hearing was improperly conducted.  As such, judgment as a matter of law in Defendants favor is appropriate.

The IDEA sets forth the minimum qualifications required for impartial due process hearing officers.  Specifically, under 20 U.S.C. §1415(f)(3)(A) a hearing officer cannot be an employee of the state educational agency or the local educational agency involved in the education or care of the child or have a personal or professional interest that conflicts with his or her objectivity in the hearing.  In addition, a hearing officer must possess knowledge of, and the ability to understand, the provisions of the IDEA, federal and state regulations pertaining to the IDEA, and legal interpretations of the IDEA by federal and state courts, possess the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice, and possess the knowledge and ability to render and write decisions in accordance with appropriate, standard legal practice.  *Id.*

In an effort to develop Plaintiff's claims, Defendants targeted several contention interrogatories to Plaintiff's allegations of hearing officer bias and deprivations or due process in

their First Set of Interrogatories.  Plaintiff's response was received by email on July 10, 2007-

fully ten days after the close of discovery.  In it, Plaintiff provided the following responses to the

contention interrogatories seeking the basis of her claims of hearing officer bias and

inappropriate conduct of the hearing:

14.    Describe in detail the basis for your contention that your were denied due process during the initial due process hearing in this matter.

**Answer:**  This answer will be supplemented.

15.    Describe in detail the basis for your contention that the Hearing Panel Inferred facts not in evidence and identify the specific facts which you contend the Hearing Panel inferred.

**Answer:**  This answer will be supplemented.

16.    Describe in detail the basis for your contention that any of the Hearing Panel members were not impartial, identifying the specific Hearing Panel members you contend were not impartial.

**Answer:**  This answer will be supplemented.

17.    Describe in detail the basis for your contention that the Hearing Panel violated Tasha Lief's civil rights in the manner in which the hearing was conducted.

**Answer:**  This answer will be supplemented.

To date, none of the forgoing responses have been "supplemented."

Nonetheless, with respect to panel member Werner, Defendants believe that the basis for

Plaintiff's allegations of bias may, in part, arise from contacts Mr. Werner had with the Delaware

Department of Education between hearing dates in the instant matter.  As Mr. Werner indicated,

at the beginning of the hearing on August 27, 2005,  "two of the contacts dealt directly with [Mr.

Werner's] role as the chair of the Governor's Advisory Council for Exceptional Citizens" and

involved "discussing methods of perhaps partially funding a new program and things of that

sort."  (Werner, 8/27, p.4).  Mr. Werner further clarified that his other contacts "are directly

related to my school district's filing for due process against us, and at no time in dealing with

anybody in the [Delaware] Department of Education have I spoken or there has been no

conversation about this hearing at all." (Werner, 8/27, pp. 4-5). Although given the opportunity

to object, Plaintiff's attorney declined to do so and instead simply stated that he "really can't take

a position. I understand what you are saying and I accept and thank you for the statement."

(Fifer, 8/27, p. 5).

First, it must be noted that Plaintiff never demanded that any hearing panel member

recuse themselves, either before, or during, the due process hearing. By failing to properly raise

the recusal issue, or object to the impartiality of any panel members at the administrative due

process hearing, Plaintiff has failed to preserve this issue on appeal. See e.g., Bd. of Educ. v.

Bauer, 2000 Westlaw 1481464 (D. Md. 2000) (objections regarding the impartiality of hearing

officers must be addressed to the hearing officers in order to be preserved on appeal in a judicial

proceeding); *Marblehead Public Schools*, 36 IDELR 170 (SEA MA 2002)[9] (parents waived

claim for recusal).

Setting aside Plaintiff's failure to identify any evidence of hearing officer bias, and her

failure to properly demand the recusal of any panel members before, or during, the due process

hearing, a brief review of administrative and judicial decisions addressing these types of claims

demonstrates the lack of merit in Plaintiff's allegations. For example, in *Delaware Valley Sch.*

*Dist.*, 38 IDELR 224 (SEA PA 2003), and IHO attended a seminar presented by the parents'

counsel on the legal impact of a recent special education decision. The district maintained that

the IHO's presence at this seminar necessitated her removal from the due process proceedings.

The state appeals panel ultimately denied the district's request for an order compelling recusal in

the "absence of anything concrete" to support the claim that the IHO was biased or lacked

impartiality. *Id.* Plaintiff's allegations in the instant matter are broadly similar to those raised by

---

[9] All of the Unreported Hearings are attached for the Court's convenience as Exhibit 1.

a disappointed parent in D.M. ex rel. E.L. v.Red Clay Consol. Sch. Dist., 2007 Del. Fam. Ct.
LEXIS 21, 57-58 (Del. Fam. Ct. 2007).  In D.M. the parent alleged that the due process hearing
panel had "erred by failing to conduct a fair, unbiased and impartial hearing."  *Id.*  In
considering this claim, the court noted that the parent alleged "without any specific citations, that
the hearing officer generally cut off her questions and answers," and that "inappropriate
statements and jokes were made on the record by the panel members and opposing counsel."  *Id.*
The court,  however, rejected the parents' claims, and determined instead that she had
"received the substantial procedural safeguards available to her under the IDEA and Delaware
law." *Id.*  Specifically, the parent was:

> afforded with notice and the opportunity to be heard.  She had the right to be
> accompanied and advised by counsel and persons with special knowledge concerning
> students with disabilities. Mother presented evidence at the hearing and cross-examined
> adverse witnesses. She also exercised her right to request subpoenas for witnesses she
> planned to call. Mother received a list of the witnesses the School District and the DOE
> intended to present and copies of the exhibits the School District intended to introduce
> prior the hearing. She received a record of the hearing and a written decision from the
> Panel containing findings of fact and law. Mother also determined whether the hearing
> would be an "open" or "closed" hearing and determined that the School District would
> present its evidence first. Thus, this Court cannot conclude that Mother was denied any
> due process rights.

*Id.; see also*, 14 Del. C. § 3138; 34 C.F.R. § 300.512 (setting forth the procedural rights afforded
to parents at due process hearings under the IDEA).

Here, the record shows that Plaintiff did not request that any panel member recuse
themselves either before or during the hearing.  With discovery closed, Plaintiff has failed to
identify any evidence of bias on the part of any panel member, nor any errors in the conduct of
the hearing.  Instead, the record shows that Plaintiff was afforded  the substantial procedural
safeguards available to her under the IDEA and Delaware law.  As such, Defendants are entitled
to summary judgment on Plaintiff's claims.

**VIII.   THE ELEVENTH AMENDMENT AND THE DOCTRINE OF SOVEREIGN IMMUNITY BAR ANY NON-IDEA OR SECTION 504 CLAIMS RAISED BY PLAINTIFF IN THE PETITION AGAINST THE DELAWARE DEPARTMENT OF EDUCATION.**

The Eleventh Amendment provides that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend XI.  The Eleventh Amendment "is a constitutional limitation on the federal judicial power established in Art. III" of the U.S. Constitution.  *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 98 (1984).  While the Amendment does not facially bar suits against the State by its citizens, the United States Supreme Court has held that in the absence of consent, a state is "immune from suits brought in federal courts by her own citizens as well as by citizens of another State."  *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974).   A State may consent to suit in federal court, but the State's consent must "be unequivocally expressed."  *Pennhurst*, 465 U.S. at 99.  Admittedly, the Delaware Department of Education has waived its "sovereign immunity for claims brought under the IDEA and the Rehabilitation Act" through its receipt of federal funds. *Corey H. v. Cape Henlopen School District*, 286 F.Supp.2d 380, 384 (D.Del. 2003).  However, to the extent that Plaintiff is alleging any non-IDEA claim or Section 504 claim pursuant to 42 U.S.C. § 1983, the Eleventh Amendment bars such a claim.

In addition, to the extent the Petition alleges that the Delaware Department of Education violated plaintiff's State constitutional rights and/or State common law rights, the Doctrine of Sovereign Immunity bars such a claim.  *See*, *Pagano v. Hadley*, 535 F. Supp. 92 (D. Del. 1982). The State of Delaware is entitled to be immune from suit in state court or on state law claims pursuant to the doctrine of sovereign immunity.  Delaware Constitution, Article I, Section 9. The doctrine of sovereign immunity can only be waived by the General Assembly.  *Doe v. Cates*,

499 A.2d 1175, 1176 (Del.Supr. 1983);  *Turnbull v. Fink*, 668 A.2d 1370 (Del.Supr. 1995);  *King*

*v. State*, 203 A.2d 74 (1964).  The General Assembly has not waived sovereign immunity in this

matter in non-IDEA. or non-Section 504 claims. (See Affidavit of Debra Lawhead)  To the

extent that Plaintiff has filed a complaint against the State of Delaware on non-IDEA or non-

Section 504 claims, the complaint against State Defendant should be dismissed and summary

judgment is appropriate.


### CONCLUSION

For the foregoing reasons and authorities cited herein, summary judgment must be

granted to the Defendants on all the claims raised in  Plaintiff's Petition.

<div style="margin-left:auto">

YOUNG CONAWAY STARGATT & TAYLOR, LLP
*/s/ Michael P. Stafford*
Scott A. Holt, Esquire (No. 3399)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor, P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone:    (302) 571-6623; 571-6553
Facsimile:     (302) 576-3299; 576-3461
Email:  sholt@ycst.com; mstafford@ycst.com
Attorneys for Defendant Cape Henlopen School District


 */s/ Craig R. Fitzgerald*
Craig R. Fitzgerald, Esquire (No. 3730)
Deputy Attorney General
Civil Division- Kent County
102 West Water Street
Dover, Delaware  19904
Telephone:    (302) 739-7641 ext 303
Facsimile:    (302) 739-7652
Email:         craig.fitzgerald@state.de.us
Attorney for Defendant Delaware Department of Education

</div>

Dated:  July 24, 2007

# EXHIBIT

# 1

**38 IDELR 224**

**103 LRP 8351**

## Delaware Valley School District
## Pennsylvania State Educational Agency
### 1331
## February 14, 2003

**Related Index Numbers**

**160.020 Impartiality Requirements**

### Judge / Administrative Officer

**Madeleine R. Kaufman, Appellate Officer**

### Judge / Administrative Officer

**Before: Cautilli, Kaufman and McElligott, Appeals Panel Officers**

### Case Summary

The IHO attended a discussion presented by the parents' counsel concerning the impact of a recent special education case. The district argued her attendance required that she remove herself from a DP proceeding in which the attorney participated. Denying the request for an order compelling recusal, the appeals panel stated there was an "absence of anything concrete" upon which to base a claim that the IHO was biased or lacked impartiality in the proceeding. There was no indication the IHO privately discussed the case in question with the parents' attorney. The panel noted that other IHOs also attended the seminar, adding that it would be difficult to find many cases in which an attorney for one of the parties does not have some sort of acquaintance with another person involved in the hearing.

### Full Text

### Appearances:

#### Background

This case comes to the Appeals Panel (hereinafter the "Panel") in the form of an Emergency Interim Appeal (hereinafter "Interim Appeal") filed by the Delaware Valley School District (hereinafter the "District"). The Interim Appeal was filed on or about January 27, 2003, the day the initial due process

hearing session was scheduled to take place. All that is known to the Panel, of significance factually, about the case[1] is that Kimberly is presumed to be a student residing in the District, that Parents initiated due process on August 27, 2002 and that Parents are seeking through due process the following: payment for Parents' unilateral private school placement; compensatory education going back to September 1999; and an independent evaluation (Interim Appeal, page 1).

The Hearing Officer requested that counsel for each party submit a brief on the first day of the hearing on the issue of the applicability of the recent decision of *Montour School District v. S.T.,* 805 A. 2d 29 (Pa. Commonw.2002)[2] with regard to the statute of limitations on the compensatory education claim put forth by Parents (letter of Hearing Officer dated January 21, 2003). The Hearing Officer further indicated, three days later, three days prior to the first hearing date, that she would allow testimony and evidence going back to 1999, three years prior to the date Parents requested due process (letter of Hearing Officer dated January 24, 2003), but will defer a decision on *Montour*'s applicability, specifically, the look-back period, until the conclusion of the hearing.

The Interim Appeal constitutes the District's attempt to have the Hearing Officer recuse herself or be removed or recused from the case by a decision of the Panel on the basis of the Hearing Officer being partial or biased.

The alleged lack of impartiality stems from the following rendition of events: In or about early December, 2002, counsel for Parents provided a discussion on both sides of the *Montour* issue in a training session in Harrisburg[3] which this Hearing Officer attended (Interim Appeal, page 1; letter of Hearing Officer dated January 21, 2003). Counsel for the District claims she "had no way of knowing what counsel for Parents advised" during that session and alleges the existence of an "ex parte communication "that was ongoing at the time of the training" and maintains that there was a tainting of the Hearing Officer by the session (Interim Appeal, page 2).

Copyright © 2007 LRP Publications                                                                 1

The Hearing Officer stated that she left early during counsel for Parents' presentation and thus may not have heard the entire discussion, but did indicate that she felt the presentation to be "balanced" (letter of Hearing Officer dated January 21, 2003). The Hearing Officer further admitted to having attended many training sessions in the course of her career presented by "many different people (i.e., school district personnel, advocates, etc.)" but feels she is nevertheless able to make her own determination on issues and represents she will do so in this instance in deciding upon the applicability of *Montour* (*Id.* ).

Parents emphasized, through their counsel, that school district representatives and Pennsylvania Department of Education representatives also provide, on a routine basis, seminars to Hearing Officers. Counsel for Parents indicated that participants at the *Montour* discussion commented to him afterward that the session was a balanced approach (letter of counsel for Parents dated January 24, 2003, page 1). He further emphasized that he has witnessed Pennsylvania state court judges in attendance at Continuing Legal Education seminars in which attorneys, including him, were presenters and comments that it would be unreasonable to expect any of these judges to recuse himself after hearing a presentation by such an attorney on a particular issue (*Id.* at page 2).

No specific allegations were presented by the District to indicate that impartiality on the part of the Hearing Officer is compromised. The basis for the allegations on the part of the District is solely the Hearing Officer's attendance at the seminar led by counsel for Parents. It is unclear if further motivation on the part of the District for seeking the recusal stems from the Hearing Officer's decision to allow evidence presented during the hearing to date back to 1999.

## Discussion

For guidance in deciding this issue, the Panel consults the Hearing Officer's Handbook. Chapter I, Section B of that Handbook, "What is an Impartial Hearing Officer?" provides as follows:

Impartial Hearing Officers are experts in special education and/or education law. The Hearing Officer assigned to a particular hearing will not be affiliated with any party to the due process hearing by employment, professional, or personal contact. In addition, a Hearing Officer is independent of the Pennsylvania Department of Education and the Office for Dispute Resolution.

Neither the District, nor the Hearing Officer, nor Parents, presents any facts demonstrating any affiliation of the Hearing Officer with a party to these proceedings. Therefore, a conclusion as to lack of impartiality cannot be supported on this basis.

Furthermore, the Hearing Officer's Handbook, Chapter II, Section C, "Discussions Between the Hearing Officer and a Person Involved in a Due Process Hearing" provides as follows:

The Hearing Officer should not discuss a case with one party without the presence of the other party before, during, or after hearing. Such contact, which is known as ex-parte communication, has been held to constitute a violation of due process.

The District concludes that ex-parte communication took place by virtue of the attendance, in and of itself, of the Hearing Officer at the *Montour* training session (*see* interim Appeal, page 2). However, no allegations were made that this particular case, the subject of this due process hearing, was discussed either during that session, or privately, outside the presence of counsel for the District. On the other hand, for the sake of argument, if the Hearing Officer and counsel for Parents had discussed the case, during the session, or privately, that might be deemed an ex-parte communication to support recusal, but that evidence has simply not been presented.

Lastly, the Hearing Officer's Handbook, Chapter II, Section D, "Hearing Officer Disqualification" provides as follows:

A Hearing Officer shall disqualify himself/herself from presiding over a hearing if any of

Copyright © 2007 LRP Publications

the following circumstances apply:

1. The Hearing Officer has a financial interest in the present hearing, e.g. the Hearing Officer is the owner of or partner in an approved private school that may be considered for the child's educational placement. in the hearing.

2. The Hearing Officer has an evidentiary conflict because of his/her prior involvement with the child, e.g., the Hearing Officer has previously evaluated the child; or

3. The Hearing Officer has a personal or professional interest that would conflict with his/her objectivity in the hearing.

No evidence whatsoever of any of the aforementioned factors has been presented in this case.

In summary, the District bases its claim for recusal or removal solely on the Hearing Officer's presence at a training session presented by counsel for Parents and attended not only by this Hearing Officer, but by other Hearing Officers as well. At that training session a new case was discussed (*Montour*) and that new case has presumed applicability to the case which is the subject of this due process proceeding. In the absence of anything concrete upon which to base a claim of lack of impartiality or bias, the Panel must deny the District's request for an order compelling a recusal of the Hearing Officer.

Other Panels have ruled similarly when confronted with this issue. *See e.g.,* Special Education Opinion No. 1143, where no basis for disqualification existed when Parents encountered the same Hearing Officer they had had in a prior due process proceeding, with whom Parents had disagreed; the Panel did not give credence to Parents' assertions that they could not be provided with an "evenhanded hearing" if this same Hearing Officer were to preside over the next case. *See also,* Special Education Opinion No. 1193, where the Panel rejected a claim of Hearing Officer bias raised by the Parent merely because of the Hearing Officer's acquaintance with counsel for the District. The following statement from

that case is particularly applicable to this one: "In fact, we would be hard-pressed to find many cases in which counsel or one of the parties in any legal proceeding does not have some sort of acquaintance with another person involved in the hearing whether in the special education due process system or in the nation's courts." (*Id.* at 3 - 4).

The mere fact of the Hearing Officer attending a training session given by a particular attorney involved in a due process process case to be decided by that Hearing Officer does not rise to the level of acquaintance sufficient to support lack of impartiality, or bias. Accordingly, the Panel decides against the District.

## Order

AND NOW, this 14th day of February, 2003, the District's motion for recusal of the hearing Officer is denied.

Any exceptions not addressed by this Opinion and Order are dismissed.

Pursuant to 22 PA Code section 14.162 (o), the parties are advised that this matter may be appealed to the Commonwealth Court of Pennsylvania, or to the appropriate federal court.

[1]All of the facts recited herein are gleaned from the Interim Appeal of the District which includes attached exhibits consisting of correspondence from counsel for both parties (i.e.: the District and the Parents) and correspondence from the Hearing Officer. Accordingly, this correspondence does not constitute evidence acquired during the hearing process.

[2]This case, recently decided by Commonwealth Court, places a one year limit, or two year limit in the presence of mitigating circumstances, with regard to the look-back period of time commencing upon the filing of the due process request, in a compensatory education claim. Former federal court cases do not support such a definitive timeline cutoff (*see,* for example, in this regard, *Ridgewood Board of Education v. N.E.,* 172 F.3d, 238 (3d Cir. 1999) and *Bernardsville Board of Education v. J.H.,* 42 F. 3d

149 (3d Cir. 1994)).

**[3]**Hearing officers were present at this training session, as was counsel for the Office of Dispute Resolution (hereinafter "ODR"). Counsel for ODR reviewed the materials presented by counsel for Parents as well as the "essence" of counsel for Parents' presentation prior to the presentation (letter of counsel for Parents dated January 24, 2003, page 1).

**Cases Cited**

172 F.3d 238

42 F.3d 149

**36 IDELR 170**

**102 LRP 9090**

## Marblehead Public Schools

## Massachusetts State Educational Agency

02-2828

### March 19, 2002

**Related Index Numbers**

**160.020 Impartiality Requirements**

### Judge / Administrative Officer

**Hearing Officer: William Crane**

### Case Summary

The IHO concluded he could impartially rule on the parents' claim that the district's current placement of their son was inappropriate and unsafe. On several occasions while employed at the state Department of Mental Health, the IHO spoke with the attorney, who was representing the district in this case, on human rights-related issues. He also cited him as an employment reference when applying for a position with the state ED. However, the IHO determined that an objective, knowledgeable member of the public would find no reasonable grounds for doubting his impartiality. Since assuming the IHO position in 1999, he said his only substantive discussions or contact with the attorney had been "within his role as a hearing officer." Additionally, the IHO said that even if he found an appearance of impermissible prejudice, he would conclude the parents had waived their claim for his recusal. He noted it was the district, not the parents, that sought his removal to avoid a possible appeal issue. The parents understood their rights regarding the issue and requested the IHO not recuse himself.

**Full Text**

**Appearances:**

### Ruling on Motion for Disqualification or Recusal

Marblehead Public Schools (hereafter, Marblehead) through its attorney (Matthew MacAvoy) has filed a Motion for Recusal or Disqualification of Hearing Officer. This Ruling addresses Marblehead's Motion.

### A. Issue

Whether the Hearing Officer's previous relationship with Marblehead's attorney (including the attorney's acting as an employment reference for the Hearing Officer with respect to his present position) should result in recusal of the Hearing Officer.

### B. Procedural History

On February 4, 2002, Parents (through their advocate Robert Augustine) filed with the Bureau of Special Education Appeals (hereafter, BSEA) a Request for Hearing, alleging that Marblehead's current education placement of their son is inappropriate and unsafe.

By Order of February 13, 2002, the Hearing Officer allowed Marblehead's request for postponement of the automatic hearing date and scheduled a preheating conference for March 8, 2002.

On February 26, 2002, Marblehead wrote a letter to the Hearing Officer describing the relationship between the Hearing Officer and Marblehead's attorney (Mr. MacAvoy) and requesting a conference call to discuss and address any conflict of interest. On February 27, 2002, the Hearing Officer conducted a conference call with Marblehead's attorney and Parents' advocate. During the call, the issue of conflict of interest was discussed, Marblehead's attorney indicated that he thought the Hearing Officer should recuse himself and the Parents' advocate stated his opposition to recusal. The Hearing Officer declined to recuse himself at that time, but he advised the parties that if Marblehead sought a more formal ruling from the Hearing Officer on this issue, it should file a motion seeking recusal.

On March 5, 2002, Marblehead filed a Motion for Recusal or Disqualification of Hearing Officer (hereafter Motion), Memorandum of Law in support of its Motion, witness list (listing only the Director of the BSEA, Jackie Belf-Becker) and six proposed exhibits (including Marblehead's letter of February

26, 2002 and an affidavit of Mr. MacAvoy). On March 6, 2002, the Hearing Officer conducted a recorded conference call with Marblehead's attorney and Parents' advocate to discuss the Hearing on Marblehead's Motion. During that conference call, Jackie Belf-Becker's interest in this matter was discussed, and the Hearing Officer denied Marblehead's request that she be called as a witness. Parents' advocate reiterated Parents' desire to oppose Marblehead's Motion. On February 6, 2002, Marblehead filed a revised witness list (adding the Hearing Officer).

A hearing on the Motion was conducted on March 8, 2002. At the Hearing, Marblehead's six proposed exhibits were admitted into evidence without objection (marked as Exhibit 1, etc.); Marblehead repeated its request to have Ms. Belf-Becker testify, which request was denied; and Marblehead's request that the Hearing Officer testify was also denied. The Hearing Officer read into the record a disclosure statement regarding his relationship with Mr. MacAvoy. Marblehead's attorney then argued its Motion, and Parents' advocate argued their opposition. The Hearing Officer then directly asked Parents several questions to determine Parents' understanding and voluntariness of their position regarding recusal of the Hearing Officer.

## C. Facts

The relevant facts are not in dispute.

Prior to becoming a Hearing Officer at the BSEA, I was employed by the Massachusetts Department of Mental Health (hereafter, DMH) as Special Assistant for Human Rights. My responsibilities included general oversight of the state-wide DMH human rights system.

During the time of my employment at DMH, Matthew MacAvoy represented a number of psychiatric patients at Taunton State Hospital as a Mental Health Protection and Advocacy attorney, and he was a member of the human rights committee at Westborough State Hospital. I supervised the DMH human rights officers at both of these state hospitals; and on a number of occasions, I spoke with Mr. MacAvoy regarding human rights at these two hospitals or within other parts of DMH.

In 1998 while Mr. MacAvoy was a Hearing Officer at the BSEA, I first applied for a position as a BSEA Hearing Officer. I was not offered this position. Subsequently, there were two openings for a Hearing Officer position, and in March 1999 I re-applied. I was then offered a position as a Hearing Officer, and began work at the BSEA in July 1999.

During the time when I applied for and was being considered for the positions at the BSEA, I spoke with Mr. MacAvoy (by telephone on several occasions and once over lunch after he left the BSEA) to learn about the Hearing Officer position and what it might be like to work at the BSEA. Also, I asked Mr. MacAvoy if he would be willing to be a reference with respect to my application to be a BSEA Hearing Officer; Mr. MacAvoy agreed to be a reference; and I then did use Mr. MacAvoy as a reference with respect to my application. I have not requested Mr. MacAvoy to be a reference for me on any other occasion.

Since becoming a BSEA Hearing Officer in July 1999, my only substantive discussions or contact with Mr. MacAvoy have been within my role as a Hearing Officer.

I do not preside over BSEA Hearings in any matter in which either of two other attorneys (named by Mr. MacAvoy in his affidavit) represents a party to the proceeding. These two attorneys served as a reference for me with respect to my application for my current employment with the BSEA.[1]

## D. Analysis

### 1. Legal Standards.

There are a number of legal standards that either apply directly or provide useful guidance to the issue of recusal by a BSEA Hearing Officer.

The standards established specifically for a BSEA Hearing Officer are found within the federal special education regulations implementing the IDEA (20 U.S.C. 1400*et seq.*) and the state regulations

Copyright © 2007 LRP Publications

implementing the state special education statute (MGL c. 71B). When addressing the issue of due process and an impartial hearing officer, the federal regulations provide:

(a) A hearing may not be conducted --

(1) By a person who is an employee of the State agency or the LEA that is involved in the education or care of the child; or (2) By any person having a personal or professional interest that would conflict with his or her objectivity in the hearing.[2]

Similarly, the state regulations provide:

Mediations and hearings shall be conducted by impartial mediators and hearing officers who do not have personal or professional interests that would conflict with their objectivity in the hearing or mediation. ...[3]

The recusal standards for federal justices, judges and magistrates are found within 28 U.S.C. § 455. Subsection (a) of § 455 provides:

Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

The federal First Circuit Court of Appeals has explained that this statute "forbids partiality whether grounded in an 'interest or relationship' or a 'bias or prejudice'; and it forbids not only the reality of partiality but its objective appearance as well."[4] The United States Supreme Court has similarly characterized subsection (a): "Quite simply and quite universally, recusal [i]s required whenever 'impartiality might reasonably be questioned.'"[5] Although these statutory standards expressly apply only to justices, judges and magistrates, they may also be applicable to an administrative decision-maker.[6]

A review of Massachusetts standards begins with Article 29 of the Massachusetts Declaration of Rights which establishes the right to judges who are "free, impartial and independent".[7] The Massachusetts Supreme Judicial Court (SJC) has indicated that the protections contained within this constitutional mandate are generally no greater than are provided for

pursuant to Massachusetts conflict of interest law, to which I now turn.[8]

SJC Rule 3:09, Canon 3 A, section 3(C)(1) requires a judge to recuse himself whenever "his impartiality might reasonably be questioned." Circumstances where a judge's impartiality might reasonably be questioned include instances where the judge "has a personal bias or prejudice concerning a party... ."[9] A comparison of these state standards with the above-described federal recusal standards indicates that they are substantially the same. And, as with the federal standard, the state code of conduct requires an "objective appraisal" of whether the decision-maker's impartiality might reasonably be questioned.[10]

The SJC has concluded that the state judicial recusal standards are equally applicable to a "disinterested person whose function is essentially judicial" -- for example, a person holding a hearing, taking evidence and making findings of fact. The SJC has also explicitly found that these standards extend to administrative hearing officers, as well as masters, auditors and all other persons authorized to decide the rights of litigants.[11] There is no doubt that these state standards apply to me as the BSEA Hearing Officer in the instant dispute; and by analogy, if not directly, the federal recusal standards also apply.

Finally, I note that in determining whether impermissible bias exists requiring recusal, the decision-maker is allotted a certain degree of discretion. Reversal on appeal occurs only upon a showing that the decision-maker abused this discretion.[12]

## 2. Integrity of the BSEA Process for Assignment of Hearing Officers.

Prior to applying the above legal standards to the facts of the present dispute, I address an argument of Marblehead related to one's general understanding of these legal standards.

Marblehead argues that since there is the possibility of impermissible prejudice, however remote, there is no good reason for me not to recuse

---

myself when, as in the present case, the parties have not introduced evidence, presented substantive arguments, exchanged discovery, participated in a preheating conference or scheduled dates for a hearing on the merits.[13] Marblehead correctly points out that there are other BSEA Hearing Officers to whom this case could be assigned, and it is not uncommon within the BSEA for there to be a reassignment of a Hearing Officer for administrative reasons.

Although there is a certain appeal to Marblehead's argument, it does not take into consideration an important part of the analysis. There is no debate that the underlying purpose of the legal standards regarding recusal are to ensure not only the reality but also the appearance of an impartial dispute resolution process. Yet, there is another important consideration, which is the integrity of the BSEA process for assignment of Hearing Officers. In the words of Judge Breyer, now Justice Breyer:

When considering disqualification, the district court is not to use the standard of Caesar's wife, the standard of mere suspicion ... that is because the disqualification decision must reflect not only the need to secure public confidence through proceedings that appear impartial, but also the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking.[14]

I now turn to an application of these legal principles to the facts of the present dispute.

### 3. Actual Prejudice.

In a series of decisions, the SJC has made clear the need for the decision-maker to engage in a two-part analysis of whether there is impermissible bias. The first level of inquiry is for the decision-maker to examine his conscience and emotions, and determine whether his presiding over this matter would be free from prejudice.[15]

I have made this examination and have concluded that I will be able to preside over this matter without prejudice to either party.

### 4. Appearance of Prejudice.

The second level of inquiry is whether the decision-maker's impartiality might reasonably be questioned. As discussed in part D1 of this Ruling, the decision-maker must make an objective, fact-based inquiry as to what a "reasonable man" would likely conclude, rather than simply inquire as to what may be in his or her own mind or that of the litigants.[16] The First Circuit Court of Appeals has explained clearly this objective inquiry:

The statute requires a judge to step down only if the charge against her is supported by a factual foundation and the facts provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality.[17]

My involvement with Mr. MacAvoy occurred at several levels. First, he and I had discussions regarding human rights concerns relevant to our professional work. Second, I inquired of him regarding the role of a Hearing Officer and working within the BSEA. This was in the context of my considering and then applying for a position as a BSEA Hearing Officer. Third, I requested, received permission and then did use Mr. MacAvoy as a reference for a position as Hearing Officer, which position I then did obtain.

Marblehead focuses only on the third level of the relationship, arguing that the employment reference in and of itself is sufficient to require my recusal or disqualification. In support of this argument, Marblehead does not cite to any case law addressing the same or comparable facts, but rather relies on the general standards which I have discussed above in part D1 of this Ruling.

My review of Massachusetts and federal case law revealed only two decisions that address the issue of reference or recommendation.

In a case involving allegations of bias by an arbitrator, the trial judge found that the arbitrator had nominated the attorney for one of the parties

(Coughlan Construction Company) to be general counsel to the Utility Contractors Association, of which the arbitrator was founder, treasurer, president, member of the board of directors, and life member. There were other aspects of the relationship, including the attorney's representation of a company belonging to one of the arbitrator's brothers. The appellate court found that the "trial judge was well justified in treating the arbitrator's association with Coughlan's counsel as a professional relationship in matters unrelated to the arbitration dispute." The appellate court concluded that there was no impermissible bias as a result of the arbitrator's nomination of a party's attorney to be general counsel to the Utility Contractors Association.[18]

Similarly, the SJC found no justification for disqualification of a trial judge as a result of his having written a letter for one of the prosecution's witnesses, recommending that he be admitted to the Massachusetts bar. The letter was written nearly thirty-five years before the trial.[19]

A review of cases more generally reveals that the courts are reluctant to establish any criteria that automatically must result in recusal. Even where there may be a significant potential for impermissible bias (either actual or by appearance), the recusal determination typically turns on the facts.[20]

For example, when faced with the question of whether a judge should recuse himself when his son or daughter is employed by one of the parties in the dispute, a careful inquiry of the entire factual context is used to resolve the matter, rather than establishing a per se rule of recusal.[21] The appearance of conflict in these cases (where a judge's son or daughter is currently employed by a party) is more substantial than an employment reference occurring three years ago. The factual analyses in these reported cases (involving a party's current employment of a judge's son or daughter) have generally concluded with a finding of no recusal.[22]

What can be gleaned from these cases is that an employment recommendation or reference should not, by itself, result in an automatic or per se recusal --

rather, the entire factual context should be carefully considered. My relationship with Mr. MacAvoy has neither been close nor personal. The employment reference at issue in the present dispute was an isolated instance of professional courtesy which did not change our overall relationship, and the employment reference occurred approximately three years ago. Since becoming a BSEA Hearing Officer in July 1999, my only substantive discussions or contact with Mr. MacAvoy have been within my role as a Hearing Officer.

I conclude that an objective, knowledgeable member of the public would find that these facts do not provide a reasonable basis for doubting my impartiality. In the words of the First Circuit Court of Appeals in a decision dismissing a claim for recusal of the trial judge based on the appearance of impermissible prejudice:

Even, however, if one may assume the survival of some residue of gratitude [towards defendant] after such a period [of time], it is beyond contemplation that such gratitude would be of the weight necessary to cause a judge to jettison his impartiality and ... violate his deepest professional and ethical commitments as a judge.[23]

In further support of this conclusion, I also note a pattern, found generally within the case law, that it is unusual for a reviewing court to require recusal when (i) the relationship in question occurred prior to the decision-maker assuming that position and (ii) the subject matter of the case brought before the decision-maker is unrelated to the relationship in question. For example, the SJC has found that it is impermissible for the relationship of attorney and client to exist concurrently with the attorney's client appearing before the attorney as the decision-maker, but this general rule is not applicable to an attorney for a party in past litigation involving issues entirely unrelated to pending issues, and in such case there is no disqualification.[24] Similarly, the federal courts have not inferred bias or prejudice when the decision-maker had a prior attorney-client relationship with one of the parties to the dispute.[25]

Copyright © 2007 LRP Publications

In addressing the need for recusal when there exists a current attorney-client relationship, the SJC has noted that the attorney-client relationship is "ordinarily so close and confidential".[26] In comparison, Mr. MacAvoy and I have never had a close or confidential relationship. I conclude that my relationship with Mr. MacAvoy (including the employment reference) is less significant, for purposes of recusal, than the typical attorney-client relationship.

For these reasons, I find that there is not an appearance of impermissible prejudice. Moreover, were I to find an appearance of impermissible prejudice, I would conclude that Parents have waived this claim, for the reasons explained immediately below.

### 5. Waiver of Claim.

Typically, an issue of conflict of interest is first raised through disclosure of certain facts that may raise a question as to the impartiality of the decision-maker. Once these facts are disclosed, the party which might be prejudiced has a limited period of time to raise the issue formally through a motion. Failure to do so may result in waiver of any claim of prejudice.[27]

The present dispute is highly unusual in that it is Marblehead (rather than Parents) that has sought my recusal even though any alleged bias would operate in Marblehead's favor (and would prejudice Parents).[28] On at least three occasions after disclosure was made to Parents, the Parents indicated that they did not intend to request my recusal and they opposed any attempt by Marblehead to obtain my recusal.

Marblehead's only interest in pressing this matter is to avoid the possibility that Parents could successfully argue on appeal (after losing on the merits) that they did not give up their right to have the Hearing Officer disqualified.[29] Marblehead has stated that it is for this reason that its Motion seeking my recusal has been filed.[30]

In its Memorandum of Law (page 6), Marblehead argues that since Parents are represented by an advocate who is not an attorney, they are without benefit of legal representation, and therefore they may not effectively waive their rights regarding recusal. At the Hearing and in its Motion (paragraph 19), Marblehead pressed this point further by taking the position that Parents' advocate was illegally practicing law by representing Parents on the issue of recusal and, more generally, representing Parents before the BSEA.[31]

Parents' advocate filed a Request for Hearing with the BSEA on behalf of Parents, and he has represented Parents in all aspects of this proceeding to date. This is not unusual. Advocates, who are not lawyers, regularly appear before the BSEA, representing students and/or their parents. Representation occurs, for example, with respect to the preheating conference, motions, discovery and formal evidentiary hearing on the merits of the claim.

The BSEA Rules 1A and ID explicitly allow such an advocate both to file a Request for Hearing on behalf of parents or student, and to represent the parents or student before the BSEA. On the basis of the BSEA Rules, I conclude that Parents' advocate may represent Parents regarding all aspects of the present dispute before the BSEA, including the issue of recusal of the Hearing Officer.

Moreover, even were Marblehead correct that the advocate cannot adequately represent Parents regarding the recusal issue, I am not persuaded that this should result in the Parents' being unable to make a binding decision regarding this matter.

On the basis of my questioning Parents directly (and their responses to me) during the Hearing on Marblehead's Motion, I have satisfied myself that Parents (completely apart from their representation by their advocate) understand their rights regarding the recusal issue and have knowingly and voluntarily made a decision to oppose the Motion and to request that the Hearing Officer not recuse himself.[32] Under these circumstances, I conclude that Parents have made a binding decision regarding the issue of recusal, independent of their representation by a lay advocate in this matter.[33]

### 6. Recusal Practice of this Hearing Officer with Respect to Other Attorneys.

Mr. MacAvoy's affidavit (Exhibit 6, paragraphs 18 and 19) states that as a general rule, I do not preside over BSEA Hearings in any matter in which either of two other attorneys (named in the affidavit) represents a party to the proceeding. The affidavit further provides that both of these other two attorneys were a reference for me with respect to my application for my current employment with the BSEA. These facts are not disputed.

Marblehead argues that my recusal in all such matters with respect to one of these two attorneys is an acknowledgement by me that serving as a reference constitutes a potential for perceived bias.[34] At the Hearing, Marblehead pressed this point further, arguing that my practice of recusal with the two attorneys should result in my recusal in the present dispute because of the common theme of employment reference.

Marblehead's arguments are misplaced. Each case of recusal must be argued and justified on the basis of its own particular set of facts.[35] In addition, any comparison that is limited to the employment reference (rather than analyzing the entire factual context) is incomplete.[36]

### 7. Other Procedural Rulings in This Matter.

During the process of addressing Marblehead's Motion, I made three procedural rulings which will be explained below.

- Marblehead sought to call me as a witness for purposes of the Hearing on its Motion. Through my testimony, Marblehead would have sought to establish that, as a general rule, I do not preside over BSEA Hearings in any matter in which either of two other attorneys (named by MacAvoy in his affidavit) represents a party to the proceeding because these other two attorneys were a reference for me with respect to my application for my current employment with the BSEA.

I denied the request for me to testify for the following reasons. For reasons discussed in footnote 35 and accompanying text of this Ruling, my past practices regarding recusal are not relevant to the present dispute. For reasons discussed in footnote 36 and accompanying text of this Ruling, the facts which Marblehead sought to establish through my testimony would not be persuasive. I also note that the facts which Marblehead sought to establish through my testimony were already included in Mr. MacAvoy's affidavit (Exhibit 6, paragraphs 18 and 19).[37]

- Marblehead sought to call as a witness Jackie Belf-Becker who is the Director of the BSEA. I denied this request for the following reasons. The only issue before me is whether my past relationship with Mr. MacAvoy requires recusal. All factual evidence necessary to address this issue was admitted into evidence through Mr. MacAvoy's affidavit or was included in my disclosure statement that I read into the record at the Hearing. Ms. Belf-Becker would, at best, have second-hand knowledge of the relationship (between Mr. MacAvoy and me) that is the subject of this dispute. So long as this information could be obtained through Mr. MacAvoy's affidavit and my disclosure statement, there was no need to have Ms. Belf-Becker testify.[38]

- During the Hearing on the Motion, Marblehead sought a disclosure of interest from Ms. Belf-Becker. I denied this request for the following reasons. Ms. Belf-Becker attended the Hearing on the Motion only as an observer. The only issue before me is whether my past relationship with Mr. MacAvoy requires recusal. Whether or not Ms. Belf-Becker may have an interest in this matter is not relevant to a resolution of this dispute. I also note that Ms. Belf-Becker's interest in this matter had been disclosed during my previous, recorded conference call on March 6, 2002 with the Parents' advocate and Marblehead's attorney.

### E. Conclusion

For these reasons, Marblehead's Motion for Recusal or Disqualification of Hearing Officer is DENIED.

[1]For reasons explained below, the facts

contained within this particular paragraph are not relevant to this Ruling, but I include them here because these facts are relied on by Marblehead and I discuss them within the Analysis section of this Ruling.

[2] 34 C.F.R. 300.508(a).

[3] 603 CMR 28.08(3).

[4] *U.S. v. Snyder,* 235 F.3d 42, 45 (1st Cir. 2000), quoting *Liteky v. United States,* 510 U.S. 540, 548 (1994).

[5] *Liteky v. United States,* 510 U.S. 540, 548 (1994), quoting 28 U.S.C. § 455(a).

[6] *See Withrow v. Larkin,* 421 U.S. 35, 46 (1975) (applying due process fair trial standards to an administrative agency).

[7] Article 29 provides in part: "It is the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit."

[8] *Varga v. Board of Registration of Chiropractors,* 411 Mass. 302, 306 (1991).

[9] SJC Rule 3:09, Canon 3A, Section 3(C)(1): "A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned ... including but not limited to instances where: (a) he has a personal bias or prejudice concerning a party. ..."; *Haddad v. Gonzalez,* 410 Mass. 855, 862 (1991).

[10] *Demoulas v. Demoulas Super Markets, Inc.,* 428 Mass. 543, 546 n. 6 (1998) and cases cited therein.

[11] *Police Commissioner of Boston v. Municipal Court of West Roxbury District,* 368 Mass. 501, 507 (1975); *Beauregard v. Dailey,* 294 Mass. 315, 324-325 (1936).

[12] *Herridge v. Board of Registration in Medicine,* 420 Mass. 154 (1995); *Haddad v. Gonzalez,* 410 Mass. 855, 862 (1991). The federal First Circuit Court of Appeals explained it as follows:

[T]he analysis of allegations, the balancing of policies, and the resulting decision whether to disqualify are in the first instance committed to the district judge. And, since in many cases reasonable deciders may disagree, the district judge is allowed a range of discretion. The appellate court, therefore, must ask itself not whether it would have decided as did the trial court, but whether that decision cannot be defended as a rational conclusion supported by [a] reasonable reading of the record.

*In re United States,* 666 F.2d 690, 695 (1st Cir. 1981).

[13] Marblehead's Memorandum of Law in support of its Motion, pages 6 and 7.

[14] *In Re Allied-Signal, Inc.,* 891 F.2d 967, 970 (1st Cir. 1989) (emphasis in original), quotation cited with approval in *Cigna Fire Underwriters v. MacDonald & Johnson,* 86 F.3d 1260 (1st Cir. 1996). *See also United States v. Snyder,* 235 F.3d 42, 45 (1st Cir. 2000) ("the unnecessary transfer of a case from one judge to another is inherently inefficient and delays the administration of justice"; "judges are not to recuse themselves lightly under § 455(a)"); *In re United States,* 158 F.3d 26 (1st Cir. 1998) ("recusal on demand would put too large a club in the hands of litigants and lawyers, enabling them to veto the assignment of judges for no good reason"); *Camacho v. Autoridad de Telefonos de Puerto Rico,* 868 F.2d 482, 491 (1st Cir. 1989) (noting that the judicial system would be "paralyzed" were standards for recusal too low); *Police Commissioner v. Boston,* 368 Mass. 501, 508 (1975) ("judge or hearing officer in some circumstances unquestionably has a duty to resist a challenge to his impartiality which is tenuous, baseless or frivolous").

[15] *Demoulas v. Demoulas Super Markets, Inc.,* 428 Mass. 543, 546 n. 6 (1998); *Haddad v. Gonzalez,* 410 Mass. 855, 862 (1991); *Lena v. Commonwealth,* 369 Mass. 571, 575 (1976) (when faced with a question of his capacity to rule fairly, the decision-maker must first consult his own emotions and conscience; if he concludes that he does not lack the capacity to act fairly and impartially, the decision-maker must then attempt an objective appraisal of whether this was a proceeding in which his impartiality might reasonably be questioned).

**[16]** *Cigna Fire Underwriters v. MacDonald & Johnson,* 86 F.3d 1260 (1st Cir. 1996). *See also* the Massachusetts cases cited in footnote 15 above.

**[17]** *In Re: United States,* 666 F.2d 690, 695 (1st Cir. 1981) (emphasis in original) (internal quotations omitted), quoted with approval in *In re United States,* 158 F.3d 26 (1st Cir. 1998).

**[18]** *Coughlan Construction Company, Inc. v. Town of Rockport,* 23 Mass. App. Ct. 994, 997 (1987).

**[19]** *Commonwealth v. Levanthal,* 364 Mass. 718, 724-725 (1974).

**[20]** *See, e.g., In re United States,* 158 F.3d 26 (1st Cir. 1998) ("Typically, cases implicating section 455(a) are fact-specific, and thus *sui generis.*")

**[21]** *See, e.g., Southwestern Bell Telephone, Co. v. FCC,* 153 F.3d 520, 522-523 (8th Cir. 1998) (determination of whether conflict exists is factually bound rather than based on a *per se* rule).

**[22]** *Id.* and cases cited therein.

**[23]** *In Re: United States,* 666 F.2d 690, 696 (1st Cir. 1981).

**[24]** *Beauregard v. Dailey,* 294 Mass. 315, 325 (1936), cited with approval in *Commonwealth v. Gogan,* 389 Mass. 255, 260 (1983). Similarly, the SJC concluded in *New York Times v. Commissioner of Revenue,* 427 Mass. 399, 409 (1998):

A lawyer for an agency who later assumes adjudicatory functions that relate to that agency's work will inevitably face matters involving issues similar to those he dealt with as a lawyer. A prosecutor or a defense attorney who becomes a judge will also often find himself in such a situation. A recusal is required only if a matter arising out of the same factual circumstances and involving the same parties later comes before the judge or an adjudicator.

**[25]** *Mitchael v. Intracorp, Inc.,* 179 F.3d 847, 860-861 (10th Cir. 1999) (judge's representation of some of the defendants in other litigation and his working with some of the defense witnesses, all prior to becoming a judge, were not sufficient to obligate judge to recuse himself); *Chitimacha Tribe v. Harry*

*L. Laws Co.,* 690 F.2d 1157, 1165-1166 (5th Cir. 1982) (where judge had represented one of defendants six years before, relationship was "too remote and too innocuous to warrant disqualification"); *Darlington v. Studebaker-Packard Corp.,* 261 F.2d 903, 906 (7th Cir. 1959) (recusal not warranted where trial judge had represented defendant in unrelated matters for a four to five year period three to four years earlier); *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith,* 976 F.Supp. 84, 87 (D.Mass. 1997) (*dicta*).

**[26]** *Beauregard v. Dailey,* 294 Mass. 315, 325 (1936), cited with approval in *Commonwealth v. Gogan,* 389 Mass. 255, 260 (1983). Similarly, the SJC concluded in *New York Times v. Commissioner of Revenue,* 427 Mass. 399, 409 (1998):

A lawyer for an agency who later assumes adjudicatory functions that relate to that agency's work will inevitably face matters involving issues similar to those he dealt with as a lawyer. A prosecutor or a defense attorney who becomes a judge will also often find himself in such a situation. A recusal is required only if a matter arising out of the same factual circumstances and involving the same parties later comes before the judge or an adjudicator.

**[27]** *United States v. DiPina,* 230 F.3d 477, 486 (1st Cir. 2000) (since defendant had not moved below for judge's recusal or otherwise raised the issue of bias, appeals court considered it waived); *United States v. Devin,* 918 F.2d 280, 294 n. 11 (1st Cir. 1990) (failure to move to recuse a judge has been held to constitute a waiver of a bias claim arising out of facts known prior to or during trial) and cases cited therein; *United States v. Murphy,* 768 F.2d 1518, 1539 (7th Cir. 1985) (disqualification based on appearance of bias can only run from time motion is made or granted).

**[28]** At the Hearing, Marblehead stated that it was not aware of a single decision in which the party who might benefit from any possible prejudice was requesting recusal, nor am I aware of any such decision.

**[29]** The implications of Marblehead's position are

clarified when one considers Marblehead's options in response to a denial of its Motion. The denial of its Motion does not give rise to the right to immediate judicial review; Marblehead must therefore wait until it receives a final decision on the merits. MGL c. 30A, s. 14; A. Cella, Administrative Law and Practice, Massachusetts Practice Series, p. 623 n. 11 (1997). *See also In Re: United States,* 158 F.3d 26 (1st Cir. 1998) (only in unusual situations would an appellate court hear an interlocutory review of a judge's refusal to recuse himself). Should Marblehead lose in a final decision on the merits, its claim of bias against the Parents is moot. Should Marblehead prevail on the merits, it has no reason to appeal.

[30]Marblehead's Motion, paragraphs 18 and 19.

[31]Marblehead points to MGL c. 221, s. 46 (prohibiting the practice of law by anyone who is not a member of the Massachusetts bar); *In the Matter of: Marilyn Arons, et. al,* 32 IDELR 253 (Delaware Supreme Court July 6, 2000); *Lowell Bar Association v. Loeb,* 315 Mass. 176 (1943) (certain practices involving advising upon a question of law relative to taxation are part of the practice of law); *Massachusetts Conveyancers v. Colonial Title,* No. 962746C (Mass. Superior Court June 5, 2001) (certain conveyancing practices constitute the unauthorized practice of law). Yet, at the same time, Marblehead takes the position (with which I agree) that as a BSEA Hearing Officer, I do not have the authority to determine whether Parents' advocate is engaged in the unauthorized practice of law.

[32]At the Motion Hearing, I made it clear to Parents that if for any reason they had concerns regarding my impartiality or objectivity and therefore would like me to recuse myself, I would automatically do so if the Parents' request was made during the Motion Hearing. I made this statement to the Parents not on the basis of the merits of the recusal issue but because there would then be a joint request from the parties for recusal prior to my addressing the merits of the special education dispute. *See Police Commissioner v. Boston,* 368 Mass. 501 (1975) (in making his decision whether to withdraw,

the hearing officer should accord "significant weight" to the fact that both parties requested him to do so).

[33]*See W.B. v. Matula,* 67 F.3d 484 (3rd Cir. 1995) (agreement waiving claims relevant to the IDEA, including civil rights claims, will bind parents if the court determines its execution was knowing and voluntary).

[34]Marblehead's Memorandum of Law, pages 5 and 6.

[35]*See In re United States,* 158 F.3d 26 (1st Cir. 1998) ("Typically, cases implicating section 455(a) are fact-specific, and thus *sui generis.* Comparison, therefore, is an inexact science."); *Diversified Numismatics, Inc. v. City of Orlando, Fl.,* 949 F.2d 382, 383 (11th Cir. 1991) (fact that judge had previously recused himself from three cases in which counsel was involved, stating that he might be biased against counsel, did not require him to recuse himself in all further cases in which that counsel was involved). I am not aware of a single state or federal decision which indicates that a comparison of the judge's or hearing officer's past practice regarding recusal would have any relevance to a determination of whether the judge or hearing officer should recuse him/herself.

[36]Any useful analogy between my relationship with Mr. MacAvoy and my relationship to the other two attorneys would need to consider (i) the nature and length of my professional relationship with those attorneys, (ii) whether I have been and continue to be friends with those attorneys, and (iii) whether I have some doubt as to whether I could be entirely impartial were they to appear before me. *See* parts D3 and D4 of this Ruling.

[37]I also note, but do not rely on, the fact that Marblehead included my name on a revised witness list submitted after the deadline for advising the Hearing Officer and the opposing party of all proposed witnesses.

[38]I also note, but do not rely on, the fact that had Ms. Belf-Becker testified, I may have had to recuse myself, and it may not have been possible to assign

Copyright © 2007 LRP Publications

the case to another BSEA Hearing Officer because of the professional relationship between Ms. Belf-Becker and the BSEA Hearing Officers. Compare *Herridge v. Board of Registration in Medicine,* 420 Mass. 154 (1995) (hearing officer's casual relationship with witness, which ended five years prior to the hearing, did not compromise her ability to assess the credibility and weight of the testimony, and therefore hearing officer correctly declined to recuse herself).

**Statutes Cited**

28 USC 455(a)

**Regulations Cited**

34 CFR 300.508(a)

**Cases Cited**

235 F.3d 42

510 U.S. 540

421 U.S. 35

891 F.2d 967

666 F.2d 690

86 F.3d 1260

158 F.3d 26

868 F.2d 482

153 F.3d 520

179 F.3d 847

230 F.3d 477

67 F.3d 484

Copyright © 2007 LRP Publications

# EXHIBIT

# 2

THE FAMILY COURT OF THE STATE OF DELAWARE
IN AND FOR SUSSEX COUNTY


CHRISTINA LIEF F/B/O RASHA LIEF      :
                                      :
          Plaintiff,            :
                                        :
     vs.                        :File No. C506-01689
                                      :Petition No. 06-10541
                                      :
CAPE HENLOPEN SCHOOL DISTRICT,     :
DEPARTMENT OF EDUCATION and        :
STATE OF DELAWARE              :
                                      :
          Defendants,         :
                                      :
                                      :


## AFFIDAVIT OF DEBRA LAWHEAD

Debra Lawhead, being first duly sworn according to law, deposes and says:

1. I am the Insurance Coverage Administrator of the State of Delaware.

2. My duties include administration of insurance coverage in all instances in which the State has waived sovereign immunity by establishing a State Insurance Coverage Program pursuant to 18 Del. C. Chapter 6501.

3. As the Insurance Coverage Administrator, I am responsible for administering the policies of the Insurance Determination Committee and therefore, I have personal knowledge of the policies established by that Committee.

4. I have reviewed the Complaint in the above-captioned case.

AFFIDAVIT OF DEBRA A. LAWHEAD
PAGE 2

5. The State of Delaware and its agency (Department of Education) thereof, has not purchased any insurance that I am aware of that would be applicable to the circumstances and events alleged in the Complaint against the State of Delaware and its agency (Department of Education) in the above captioned matter.

6. The General Assembly of the State has not appropriated any money for obtaining said insurance, nor has the General Assembly enacted any legislation pertaining to or allowing any possible liability of the State resulting from the facts as alleged in said Complaint.

7. None of the commercial insurance secured for the State during any fiscal year provided for coverage for the type of injury asserted in the complaint in the above captioned matter.

8. The facts and circumstances stated in this Affidavit are true and correct to the best of my knowledge.

_DEBRA LAWHEAD_
Insurance Coverage Administrator
State of Delaware

**SWORN TO AND SUBSCRIBED** before me this 24th day of July 2007.

_Sharon L. Windsor_
NOTARY PUBLIC

